[No. B143841. Second Dist., Div. Three. Feb. 9, 2001.]

GLENN HIGHTOWER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
DANIEL O'DOWD, Real Party in Interest.

1416

## COUNSEL

Quinn, Emanuel, Urquhart, Oliver & Hedges, Harold A. Barza, Edith Ramirez; Greines, Martin, Stein & Richland and Robin Meadow for Petitioner.

No appearance for Respondent.

Bryan Cave and Frank E. Merideth, Jr., for Real Party in Interest.

## OPINION

**CROSKEY, J.**—In this writ proceeding, we examine the question of whether an arbitrator, in order to provide a proper remedy for the prevailing party, may resolve certain critical areas of a dispute in a *"partial* final award" but reserve jurisdiction to later decide, by a *"final* award," issues which will likely arise as a result of the implementation of that remedy. In the specific factual context of this case, we answer that question in the affirmative.

Petitioner, Glenn Hightower (Hightower) seeks a writ of mandate compelling the superior court to either (1) vacate the "partial final award" issued by the arbitrator or (2) confirm that award and enter judgment so that Hightower can proceed to attack on appeal the validity of that award and the superior court's refusal to vacate it. Daniel O'Dowd (O'Dowd), the real party in interest, opposes Hightower's petition and claims, inter alia, that the utilization of a "partial final award" and the express reservation of jurisdiction to resolve any remaining issues was a procedurally proper way to handle this particular dispute involving enforcement of a corporate shareholder agreement and its reciprocal buy-sell provisions. Thus, O'Dowd also urges that we direct the trial court to confirm the award.

As we explain below, we agree with O'Dowd and conclude that such incremental award process is within the "broad scope" of an arbitrator's authority to fashion an appropriate remedy. It is not precluded by nor offensive to the California Arbitration Act (Code Civ. Proc., § 1280 et seq.),[1] nor is it prohibited by the rules which the parties agreed would govern the arbitration of their dispute.[2] Parenthetically, it is relevant also to note that the use of interim awards is a proper means, under the Federal Arbitration

---

[1] Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

[2] The parties agreed to be bound by the Commercial Arbitration Rules of the American Arbitration Association (AAA), as amended and effective on July 1, 1996, which were in

Act (9 U.S.C. § 1 et seq.), of granting provisional relief such as was awarded in this matter. Finally, and most significantly, the very nature of the stock buy-sell dispute which the parties had agreed to submit to arbitration necessarily presented a reasonable likelihood that an interim award might be required, and thus we have no trouble concluding that the parties implicitly consented to such a process. For all of those reasons, we will conclude that the arbitrator's "partial final award" was procedurally proper and was confirmable *as such* by the superior court. Thus, we will issue a peremptory writ of mandate directing the trial court to enter an order of confirmation and an interlocutory judgment and to refer the matter back to the arbitrator for such further proceedings as may be appropriate.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

This is the second time we have had occasion to address issues arising out of the shareholder dispute between Hightower and O'Dowd.[4] Thus, we are already familiar with the factual context in which this dispute has arisen.

In 1982, Hightower and O'Dowd jointly formed Green Hills Software, Inc., a Delaware Corporation (Green Hills). Until October 13, 2000, they each owned one-half of the stock[5] and constituted the corporation's board of directors and officers.[6] O'Dowd was active in the day to day business affairs of Green Hills, while Hightower was not, except for some recruiting and marketing activities beginning in about 1991. After 1991, the company enjoyed substantial growth and went from five to approximately 100 employees and achieved an annual growth rate of about 40 percent. By 1997, its annual revenues exceeded $20 million and its annual profits exceeded $8.5 million.

---

effect at the time of the arbitration demand. (See fn. 8, *post*). Rule 43 of those rules provided, in part: "The arbitrator may grant *any remedy or relief that the arbitrator deems just and equitable* and within the scope of the agreement of the parties. . . ." (Italics added.) At oral argument the parties were informed that we intended to take judicial notice of these rules. (Evid. Code, §§ 452, subds. (g) & (h), 455, subd. (a), 459.) The parties agreed that these were the rules applicable to the arbitration and orally stipulated that we could judicially notice them.

[3]The facts, which we recite, are either undisputed or are reflected by the findings of the arbitrator after the receipt and consideration of an extensive evidentiary presentation.

[4]On July 1, 1999, we filed an unpublished opinion (*Hightower v. O'Dowd* (B126119)) affirming a trial court order granting Hightower's request for a preliminary injunction to stay certain shareholder buy-out activities pending completion of the arbitration proceedings which are now before us.

[5]Green Hills was originally formed as a California corporation, but later was reincorporated in the State of Delaware. There was also a third party involved who was later bought out. Thus, O'Dowd and Hightower were, at all relevant times until October 13, 2000, Green Hills's only shareholders and they each owned approximately 50 percent of the outstanding stock.

[6]Hightower was the corporate secretary and chairman of the board. O'Dowd served as president and treasurer.

O'Dowd and Hightower are parties to a written agreement that defines their rights as shareholders (Shareholders Agreement).[7] It contains a buy-sell provision which allows either shareholder to offer to sell his shares to the other. The shareholder who makes the offer (the Offering Shareholder) sets a purchase price and deposits it with the company. The other party (the Designated Shareholder) then has 90 days in which either to sell his shares to the Offering Shareholder at the price offered or to buy the Offering Shareholder's shares at the same price.

Once initiated, the buy-sell process is essentially self-executing. If the Designated Shareholder deposits the purchase price with the company within 90 days, the company must transfer the Offering Shareholder's stock to the Designated Shareholder and pay the Offering Shareholder the purchase price. If the Designated Shareholder does not make the deposit, the reverse occurs (i.e., the company will transfer the Designated Shareholder's stock to the Offering Shareholder and pay the Designated Shareholder the purchase price originally deposited by the Offering Shareholder). In addition, the Shareholders Agreement requires that the purchase price be at least 10 times Green Hills's per-share earnings for the four previous fiscal quarters. This provision, and the Shareholders Agreement's reciprocal nature, provide a check on one party making an unreasonably low offer for the other's stock. Obviously, a shareholder who offers too little runs the risk that he might have to sell his own stock at that price.

Hightower and O'Dowd had previously discussed taking Green Hills public when its revenues reached $40 million. In connection with those discussions, they adopted a stock option plan for the employees and issued options in 1997. Some additional options have been granted subsequently. Most of the employees hired before 1998 are participants in the stock option plan.

O'Dowd decided sometime in 1997 to make an offer to buy Hightower's shares. He informed Green Hills's top management (vice-presidents Craig Franklin, David Chandler and John Carbone) of his intent late in 1997 and announced his plan at a company-wide meeting on January 21, 1998. Hightower was informed the next day, on January 22, 1998, of O'Dowd's intended buyout, although no formal offer to buy Hightower's shares was made until June 26, 1998. On January 21, 1998, O'Dowd also announced

[7]The Shareholders Agreement has a choice of law clause which provides that: "This agreement and each of its provisions, shall be governed by the laws of the State of Delaware." Neither party, however, has raised any issue as to the impact of such clause. Therefore, in the resolution of the essentially procedural issue which has been presented to us, we will look to and apply California law.

that he would turn day-to-day management of the company over to the three vice-presidents so that he could devote his attention to raising the funds necessary to buy out Hightower. O'Dowd told the vice-presidents, and later told the employees of Green Hills at the January 21, 1998 meeting, that it was his intent, after he acquired Hightower's shares, to sell them back to the company for his cost; the effect of this transaction would be to make the employees' options worth almost twice as much as they otherwise would be, because approximately one-half of the 65,000,000 shares of Green Hills would have been retired.

O'Dowd succeeded in obtaining financing for his offer from Behrman Capital (equity financing) and Fleet Bank (debt financing) and made his formal offer to purchase Hightower's shares for $47 million on June 26, 1998. Hightower received the offer on June 29, 1998, and immediately set out to obtain his *own* financing sufficient to buy O'Dowd's shares for the $47 million price set by O'Dowd's offer. He interested Safeguard Scientifics, Inc., and SCP Private Equity Partners, Inc. (Safeguard) in the possibility of investing in Green Hills.

Safeguard personnel and consultants visited Green Hills, with Hightower, on August 6 and 7, 1998, for the purpose of conducting the necessary due diligence. Several key Green Hills employees were designated by Safeguard and were interviewed over a two-day period. O'Dowd was interviewed separately. Counsel for Hightower and Green Hills attended most of the interviews, but they were not permitted to attend the O'Dowd interview. During the course of the interviews, Safeguard representatives were informed that each of the vice-presidents intended to resign if Hightower succeeded in taking over Green Hills. Safeguard later learned that numerous other employees had stated in writing that they supported O'Dowd and did not support Hightower; some also stated that they intended to resign if O'Dowd no longer led the company or if Hightower succeeded in his buy-out. In addition, a petition was later sent to Safeguard signed by 60 employees, including the vice-presidents and most of senior management, indicating that the investment Safeguard proposed to make in Green Hills was ill-advised because of the likelihood of employee departures and Hightower's inability to manage Green Hills effectively.

Apparently as a result of these events, Safeguard declined to participate with Hightower in the financing of his buyout of O'Dowd's shares and he therefore was unable to do so. Hightower responded to these circumstances by making a written demand for arbitration on August 24, 1998, pursuant to

the arbitration clause in the Shareholders Agreement.[8] He also initiated litigation for the purpose of obtaining a preliminary injunction to preclude O'Dowd from going forward with the self-executing buyout of Hightower's shares pursuant to his $47 million offer of June 26, 1998.[9] Hightower contended that O'Dowd had improperly and unfairly created an atmosphere and environment which made it impossible for Hightower to obtain the financing needed to exercise his contractual right to purchase O'Dowd's shares. After some supplemental amendments to the arbitration demand, the filing of an answer and counterclaim by O'Dowd and the conduct of document discovery, there was an extensive evidentiary hearing. It commenced on August 2, 1999, and extended until January 30, 2000, during which period there were 38 hearing days. This was followed by written briefs, oral argument and motions. The matter was finally submitted on April 14, 2000, and an award was issued on April 25, 2000.[10]

Hightower raised a number of claims in the arbitration. His primary claim, however, was that O'Dowd had, by all of the actions described above, violated his fiduciary duties to Hightower and had breached the covenant of good faith and fair dealing which was implied in the Shareholders Agreement and thereby had deprived Hightower of a fair opportunity to meet O'Dowd's stock purchase offer. Hightower accused O'Dowd of directly or indirectly inducing Green Hills employees (and particularly the three vice-presidents) to threaten Safeguard that they would quit if Hightower purchased O'Dowd's shares and acquired control of Green Hills. Additionally, he alleged that O'Dowd induced the vice-presidents to cause those who reported to them to make such threats and to sign a petition intended to discourage Safeguard from financing Hightower's buyout of O'Dowd's shares.

Hightower also asserted that O'Dowd misused corporate assets by securing the assistance of Green Hills employees in his efforts to find financing and in inducing or instructing Green Hills employees not to cooperate with Hightower and with Safeguard during its due diligence, while at the same time making extensive use of employee time and other Green Hills resources in aid of his own due diligence efforts.

---

[8]The Shareholders Agreement had an arbitration clause that provided, in relevant part: "[A]ny dispute between the parties hereto pertaining to this Agreement or to the Company shall be resolved by arbitration in Los Angeles, California, in accordance with the rules then prevailing of the American Arbitration Association, and the award of the panel of arbitrators shall be enforceable by any court having jurisdiction over the parties." (Italics added.)

[9]As already indicated, the trial court granted such injunctive relief and we affirmed the order in our earlier decision of July 1, 1999. (See fn. 4, ante.)

[10]Due to the stipulations of the parties and extensions granted to Hightower by the arbitrator for the filing of additional papers, there is no claim that the arbitrator failed to file a timely award.

Hightower also contended that he had been locked out of Green Hills in March of 1998 on the pretext of having entered the company premises over the March 14, 1998, weekend and accessing employee offices and personal information maintained in employee computer files without the employees' permission. Thereafter, Hightower's access to Green Hills and its documents and records was limited to requests made through corporate counsel while, at the same time, O'Dowd had full, unrestricted, and immediate access to all Green Hills documents and employees. As already noted, Hightower contended that all of this was done to unfairly prevent him from effectively exercising his rights under the Shareholders Agreement.

Each of the claims and contentions raised by Hightower was considered and rejected by the arbitrator. As the arbitrator put it, "It is apparent that Hightower's failure to finance his purchase of O'Dowd's shares was primarily caused by the actions of Green Hills employees which caused Safeguard not to finance the purchase. In a business whose principal asset is its intellectual property created, marketed and serviced by its employees, the threat that many employees would depart *en masse* in the event of a change of ownership, or anything resembling such an eventuality, justifiably caused Safeguard to rethink the wisdom of its proposed investment. If O'Dowd caused or induced that conduct, he would have violated the Agreement and his fiduciary duties to Hightower." After considering the very substantial documentary and testimonial evidence that had been presented to him during the extensive arbitration proceedings, the arbitrator concluded that nothing O'Dowd did or failed to do *improperly* contributed to Hightower's loss of his needed financial support.

Specifically, the arbitrator concluded that O'Dowd did nothing wrong in publicly announcing his plans to make an offer to Hightower and advising company officers and employees of his intention to share with corporate employees any profit which might result to employee pension plans from the purchase and cancellation of Hightower's shares. Nor did O'Dowd *improperly* induce either his employees or the senior corporate officers to take action which had a negative impact on Hightower's efforts to obtain his own financing. As we have noted, the adverse statements made by the three Green Hills vice-presidents and several of the employees regarding Hightower and their refusal to remain with the company should he succeed in purchasing O'Dowd's stock clearly had a negative and decisive impact on Hightower's attempt to obtain financing. However, the arbitrator concluded that O'Dowd did nothing to induce such responses; rather they were the

product of honestly held and apparently justified beliefs of corporate officers and employees.[11]

The arbitrator thus concluded that Hightower simply had not proven his claims for breach of fiduciary duty, breach of the implied covenant, interference with contract or fraud and had proven no basis for either declaratory relief, an injunction or damages.[12] Based upon this conclusion, the arbitrator determined that O'Dowd had been legally entitled to complete the purchase of Hightower's shares on September 24, 1998 (i.e., 90 days after his June 26, 1998 offer) and that it was therefore necessary for the arbitrator to fashion a remedy that would give O'Dowd the "benefit of his bargain under the Shareholder/Agreement." The arbitrator emphasized that O'Dowd's original financing arrangements were no longer available and that it was unclear whether he would be able now or in the future to make a comparable deal.

---

[11] In his award of April 25, 2000, the arbitrator made express findings on this issue: "[T]he evidence proves rather dramatically that each of the Vice-Presidents had personal and unique reasons why they would never be willing to work for Hightower; their individual decisions to leave in the event Hightower succeeded in taking over Green Hills were clearly motivated by those personal concerns. Indeed, their decisions may not have been in their personal or financial best interest (loss of stock options, loss of sales commissions, necessity to find other work probably out of the area necessitating periods of unemployment and requiring them to uproot their families). Nevertheless each decided, independently of each other and of O'Dowd, to quit if Hightower succeeded and O'Dowd departed Green Hills. They did so not because of any indictment by O'Dowd but because they each believed that they could not and would not work at a Green Hills run by Hightower. [¶] Each Vice-President had a sizeable financial interest in O'Dowd succeeding in his buy-out by virtue of the likely increased value of their options. It would be naïve to think that O'Dowd did not calculate the effect of his plan to sell Hightower's shares back to the Company if he succeeded in buying them nor that O'Dowd was not pleased by the decisions of his top managers to support his plan. But these circumstances do not establish any conspiracy or agreement between those individuals and O'Dowd to do what they did. Rather, Hightower and his history with the Company and with each of these individuals was the direct cause of their individual decisions. Hightower failed to prove that O'Dowd's conduct caused the actions taken by the Vice-Presidents. . . . [¶] . . . [With respect to the other corporate employees] the evidence credibly establishes that it was largely the reverence of those employees [for] O'Dowd's leadership and their concern about a Hightower-led Green Hills which motivated their actions. They believed that the success of the Company had been and was largely the result of O'Dowd's leadership and that the future prospects for Green Hills (and the value of their stock options) were at best uncertain under Hightower. [¶] In part this belief was derived from the employees' personal history with O'Dowd and the obvious success the Company enjoyed. Many of the employees had had some exposure to Hightower over the years, some more than others, and in part their impressions were formed by this direct information. They were also undoubtedly influenced by the example of the Vice-Presidents, who made no secret of their intentions. The senior executives' announced intentions to depart Green Hills constituted an indictment of Hightower as well as a likely self-fulfilling prophesy about the future of Green Hills."

[12] There were several other derivative and/or peripheral claims asserted by Hightower that the arbitrator also expressly considered and rejected. For obvious reasons, we have no need to summarize or review them here.

Therefore, the arbitrator stated, "The intent of this award is to provide [O'Dowd] the benefit of the prior deal *as closely as that may now be approximated.*" (Italics added.)

In pursuit of that goal, the arbitrator issued, on April 25, 2000, a "Partial Final Award" that provided:[13]

(1) O'Dowd was entitled to have the preliminary injunction (that we previously affirmed—see fn. 4, *ante*) lifted immediately because Hightower had failed to prevail on the merits of his claims.[14]

(2) But for the breach by Hightower of the Shareholders Agreement, Hightower's legal or beneficial interest in Green Hills would have terminated on September 24, 1998; and after the retirement of Hightower's shares pursuant to the Shareholders Agreement, O'Dowd would have been the legal and beneficial owner of 100 percent of the shares of Green Hills as of that date. Hightower was obligated on September 24, 1998, to tender those shares for $47 million, and O'Dowd was obligated as of September 24, 1998, to pay $47 million for those shares. Hightower's breach excused O'Dowd from performing his reciprocal obligations.

(3) O'Dowd has the right, but not the obligation, to pay or cause Green Hills to pay to Hightower the consideration for the shares required as of September 24, 1998, or $47 million. O'Dowd and Green Hills shall have the option to make that payment on certain specified conditions.[15]

Of greatest significance to the resolution of the issue before us, the arbitrator specifically provided that: "*This award shall be deemed a Partial*

---

[13]We here summarize and/or quote from the award to provide factual context for our subsequent discussion of the propriety of the making of a "partial" or "interim" award.

[14]We are informed by the parties that the injunction was in fact lifted by the trial court sometime after April 25, 2000. This allowed O'Dowd to go forward and attempt to complete the purchase of Hightower's shares. As we discuss below, the delivery of the purchase price ($47 million) and the transfer of Hightower's shares took place on October 13, 2000.

· [15]There were 10 such conditions, which the arbitrator described as follows:

"1. The purchase price of $47 million is established by the prior offer of [O'Dowd] dated June 26, 1998.

"2. The purchase price shall be offset and reduced by all dividends paid to [Hightower] based on Green Hills' earnings for the Third Quarter of 1998 and thereafter until the date of purchase of [Hightower's] shares; said offset shall be reduced by the amount of ordinary taxable income of Green Hills (excluding long term capital gains) attributable to [Hightower] for the period September 24, 1998 until the purchase date multiplied by a fraction the numerator of which is .1367 and the denominator of which is .7070.

"3. The purchase price shall be offset and reduced by all salary paid to [Hightower] for the period September 24, 1998 to the date of purchase of [Hightower's] shares; said offset shall be reduced by any amounts actually withheld from such salary.

"4. The purchase price shall also be offset and reduced by the amount of attorneys' fees, costs and expenses found to be due to [O'Dowd], in the amount of $2,512,338.87.

*Final Award as to those issues finally determined herein so that the parties may return to the Los Angeles Superior Court for the purpose of dissolving the injunction and so that this award may be confirmed and the option period may begin to run. The arbitrator reserves jurisdiction to determine additional issues as may arise between the parties during this period.*" (Italics added.)

In addition, the award specified that the arbitrator *reserved jurisdiction* to determine a number of specific additional issues likely to arise after O'Dowd resubmitted his offer to purchase Hightower's shares. For example:

(1) O'Dowd was awarded the costs that he would have to incur in order to obtain the new financing needed to make the purchase; those costs were obviously unknown as of the date of the partial final award (but could not exceed $1,276,843.07), and so the arbitrator reserved jurisdiction "to determine the extent to which such costs shall constitute an offset to the purchase price on the basis that they are comparable to the costs previously incurred in connection with the September 24, 1998 offer to purchase transaction."

(2) If O'Dowd failed to tender the required consideration for Hightower's shares, then O'Dowd would nonetheless be entitled to an award of

"5. Because the offsets in §§ 2 and 3 above are necessarily based on estimates, either party may request readjustment of the purchase price after the transaction is completed and based on actual numbers. *The arbitrator reserves jurisdiction to order such adjustments.*

"6. The option to purchase [Hightower's] shares may be exercised by [O'Dowd] at any time from the date of this award and until six months after confirmation of this award, including the final disposition of any appeals from such confirmation. The date of purchase of [Hightower's] shares for purposes of computing the purchase price and for all other purposes shall be the date [O'Dowd] tenders the payment price to [Hightower]. Tender shall be made by [O'Dowd] or his agent presenting a check or checks aggregating the full amount of the purchase price made payable to [Hightower] drawn on good funds in United States banks at the offices of counsel for [Hightower] during regular business hours and after giving at least two hours telephonic or fax notice thereof.

"7. Simultaneously with and in exchange for the tender, [Hightower] or his agent shall deliver to [O'Dowd] all of [Hightower's] share certificates in Green Hills with properly endorsed stock powers ('Shares').

"8. In the event [Hightower] does not deliver his Shares to [O'Dowd] simultaneously with the tender, [O'Dowd] shall hold the check or checks for the purchase price for delivery to [Hightower] in exchange for Shares for five days. During such time, the exchange may be made by [Hightower] or his agent presenting the Shares at the offices of Green Hills or such other location as [O'Dowd] may designate in writing, during business hours and after giving at least 12 hours telephonic or fax notice thereof.

"9. In the event the exchange does not take place within the foregoing five days, [O'Dowd] may release the funds for the purchase price, and the amount and procedures for any payment to [Hightower] for the Shares *shall be determined by the arbitrator, who reserves jurisdiction for such purpose.*

"10. Notwithstanding the foregoing procedure for a delayed exchange and for further arbitral proceedings, [O'Dowd's] purchase of [Hightower's] shares for all purposes shall be deemed to have occurred on the date [O'Dowd] tenders the purchase price as provided herein." (Italics added.)

damages (attorney's fees and recoupment of financing charges) which would have to be determined by the arbitrator and included in the "final" award.

(3) In the event that the transfer of Hightower's stock and the payment of the purchase price did not take place within the time period specified in the partial final award, jurisdiction was reserved to determine the amount and procedures for payment to Hightower.

(4) Although the arbitrator determined that O'Dowd was the prevailing party and was entitled to an award of attorney's fees in the sum of $2,512,338.87, as of April 25, 2000, he also held that O'Dowd "may seek a supplemental award, to be included in the final award, for attorneys' fees, costs, and expenses incurred in this proceeding through entry of the final award."

(5) Neither Hightower nor O'Dowd would have any right to seek any damages for any injury occurring to either during the option period and relating to Green Hills or the Shareholders Agreement, other than as part of this arbitration, and jurisdiction was reserved for this purpose.

Hightower's response to the publication of the arbitrator's Partial Final Award was to file, on May 16, 2000, a petition with the superior court to vacate the award pursuant to section 1286.2.[16] Hightower urged, inter alia,[17] that (1) the arbitrator had exceeded his powers "by retaining jurisdiction over potential future disputes that neither party has agreed to arbitrate" and (2) the Partial Final Award was, by its own terms, not final and therefore was in violation of section 1283.4.[18]

This petition was denied by the trial court on June 27, 2000.[19] The court reasoned that section 1283.4 did not preclude the arbitrator's utilization of a

---

[16]Section 1286.2 provides, in relevant part: "[T]he count *shall* vacate the award if the court determines any of the following: [¶] . . . [¶] (d) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Italics added.)

[17]Hightower advanced several other arguments in support of his petition to vacate the partial final award, but he does not advance them in his petition to this court and we therefore need not address them in this writ proceeding. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

[18]Section 1283.4 provides that: "The award shall be in writing and signed by the arbitrators concurring therein. It shall include *a determination of all the questions* submitted to the arbitrators the decision of which is necessary in order to determine the controversy."

[19]The trial court's order only denied Hightower's petition, it did not then go on to confirm the Partial Final Award as was required by section 1286. (See *Louise Gardens of Encino Homeowners' Assn., Inc. v. Truck Ins. Exchange, Inc.* (2000) 82 Cal.App.4th 648, 658, 660 [98 Cal.Rptr.2d 378].) Hightower raised this issue with the trial court in a memorandum filed on August 11, 2000, but he did not actually file a petition for confirmation.

partial final award because that award did determine all issues necessary to the "determination of the controversy." As the trial court put it, "The Partial Final Award appears to meet this requirement that the controversy be determined. The fact that the Award does not provide the exact dollar figure for the price of Hightower's shares does not appear to render the issues undetermined. The Award provides a specific formula to determine the price."[20]

On August 29, 2000, Hightower filed his petition herein seeking a writ of mandate requiring the trial court to either (1) vacate its order denying Hightower's petition to vacate the arbitrator's partial final award and enter a new order granting it or (2) enter an order confirming the partial final award and entering judgment thereon.[21] We issued an order to show cause on September 27, 2000, and set this matter for oral argument.

O'Dowd apparently thereafter obtained the new financing needed to purchase Hightower's Shares. The preliminary injunction previously having been lifted, he tendered the sum of $41,585,388 on October 13, 2000.[22] These sums were accepted by Hightower,[23] albeit under a claimed protest.[24] On the same day, Hightower surrendered his stock certificates with stock powers in blank as specified in the arbitrator's partial final award. Those shares were transferred to Green Hills on that same day and cancelled. On

[20]If it was the trial court's view that the partial final award did resolve all issues arising out of this stock buy-sell dispute, then we must disagree. In our view, and obviously in the arbitrator's, a number of potential, unresolved issues conditionally remained. That is why the arbitrator designated his award as a "partial" award. As we explain, the trial court correctly denied Hightower's petition to vacate the award not because it in fact had resolved all issues, but rather because the use of a "partial" or "interim" order was proper in the circumstances.

[21]This alternative relief was requested by Hightower so that he could then file an appeal from the trial court's denial of his petition to vacate. From Hightower's perspective, this was simply a procedural request to permit him to attack on appeal the merits of the trial court's denial of his petition. He does not actually advance the proposition that the partial final award should be confirmed on its merits. O'Dowd, on the other hand, also argues that the award should have been confirmed, but he does so because he contends the arbitrator was procedurally correct in making that award. We thus have the unusual circumstance of both parties seeking the same apparent relief, albeit for different purposes and for different reasons. As we explain below, we will grant the requested relief but we do so for the reasons urged by O'Dowd.

[22]This sum is less than the $47 million specified in O'Dowd's original June 26, 1998 offer, which was endorsed and enforced by the partial final award. It appears that O'Dowd has taken the deductions from the amount to be paid to Hightower as specified or estimated in the partial final award. Whether any or all of such deductions are accurate or proper is not clear. However, that is not an issue before us in this matter, but rather it is a question properly addressed to the arbitrator following remand.

[23]These funds were paid in the form of two checks, which were immediately endorsed and deposited by Hightower. The checks cleared O'Dowd's bank on October 16, 2000.

[24]Hightower's "acceptance" of O'Dowd's payment was made under protest as described in his counsel's cover letter of October 13, 2000 to Frank Meredith, counsel for O'Dowd:

October 23, 2000, O'Dowd's counsel wrote to the arbitrator and requested a hearing on the remaining issues so that a *final* award could be issued.[25] Hightower's counsel responded on October 25, 2000, with his own letter to the arbitrator objecting to any hearing pending a determination by this court as to whether the Partial Final Award is valid and the arbitrator properly reserved jurisdiction as to any additional issues.[26]

---

"You have tendered to us an amount which you have advised us is the sum called for in the arbitrator's Partial Final Award, a sum that Mr. Hightower is not able to verify, so as to obligate Mr. Hightower to deliver his Green Hills shares to Mr. O'Dowd.

"In response to your client's invocation of the Partial Final Award, which requires that Mr. Hightower deliver to Mr. O'Dowd all of Mr. Hightower's share simultaneously with your tender of this sum, we are handing you herewith Mr. Hightower's shares of Green Hills, with stock assignment separate from certificate.

"Please be advised that we do so under protest, and under compulsion of the Partial Final Award, and your invocation of it only, and without waiver of any rights or remedies of Mr. Hightower, including his right to seek to and [*sic*] vacate and/or modify the Partial Final Award, pursuant to the proceeding now pending in the Court of Appeal, or other proceedings which may occur with respect to this matter.

"Mr. Hightower does not voluntarily acquiesce in or recognize the validity of the arbitrator's award. He takes the position that he is not entitled to the check you have delivered that Mr. O'Dowd or Green Hills is not entitled to Mr. Hightower's shares, and that Mr. O'Dowd or Green Hills will be holding such shares in trust for Mr. Hightower. He further takes the position that the award will be vacated and rendered a nullity."

[25]The October 23, 2000, letter of O'Dowd's counsel addressed to the arbitrator stated:

"This is a request on behalf of Mr. O'Dowd for an immediate hearing before Mr. Chernick on the following matters:

"1. Mr. O'Dowd's claim that his tender on October 13, 2000 of $41,585,388 which was accepted by Mr. Hightower was effective to terminate any interest of Mr. Hightower in Green Hills Software, Inc. Mr. O'Dowd's tender letter, the Declaration of Robert Hull respecting the purchase price pursuant to the award (which had not been disputed by Hightower) and the cancelled checks cashed by Mr. Hightower are attached hereto as Exhibits A, B and C, respectively.

"2. Mr. O'Dowd's claim that Mr. Hightower, who was terminated as an officer and director of Green Hills Software, Inc. on October 13, 2000, is obligated to return to Green Hills Software, Inc. all original minutes, shareholders records and other original records obtained or created by him in his capacity as Secretary of the corporation. A copy of Mr. O'Dowd's demand letter which has been ignored by Mr. Hightower is attached hereto as Exhibit D.

"3. Mr. O' Dowd's claim that Mr. Hightower must return to Green Hills Software, Inc. all propriety data, whether in written or electronic form that he obtained by reason of his position as a director and officer of that corporation. A copy of Mr. O'Dowd's demand letter which has been ignored by Mr. Hightower is attached hereto as Exhibit E.

"4. Mr. Hightower's claim set forth in the letter from his counsel dated October 13, 2000, attached hereto as Exhibit F, that Mr. O'Dowd's purchase of all of his shares in Green Hills Software, Inc. was under duress or some form of improper compulsion.

"5. Mr. O'Dowd's claim for attorneys fees incurred after April 1, 2000.

"6. Upon resolution of the foregoing claims, a Final Award.

[26]We have been advised that on December 29, 2000, the arbitrator issued a ruling setting a briefing schedule and a date for hearing on O'Dowd's request for ruling on the remaining issues. That hearing has been scheduled, after one continuance, for March 26, 2001.

CONTENTIONS

As should be obvious from the foregoing recitation, the issue before us is whether the arbitrator's Partial Final Award and his concurrent reservation of jurisdiction was proper. Hightower contends that the award is invalid as contrary to section 1283.4 and should have been vacated on that ground by the trial court. He argues that the purpose and effect of section 1283.4 is to mandate a *single* final award which resolves *all* issues placed in dispute by the parties and thus an arbitrator is without power to issue partial or "piecemeal" awards; and any attempt to reserve jurisdiction as to other issues that have not yet arisen is an exercise of power that was not agreed to by the parties and therefore is invalid.

O'Dowd responds that the arbitrator, given the nature of the factual and legal issues presented, acted properly in issuing an initial partial award that effectively decided the basic dispute between the parties. The remaining or reserved issues were ones that necessarily could not be resolved until certain acts or conditions described in the partial award had occurred or had been satisfied. Thus, a writ of mandate should be granted, directing the trial court to confirm the partial final award and refer whatever issues remain to the arbitrator.[27]

DISCUSSION

1. *Limitations on Judicial Review of Arbitration Awards*

California has a long-established and well-settled policy favoring arbitration as a speedy and inexpensive means of settling disputes. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251].) This policy is reflected in the comprehensive statutory scheme set out in the California Arbitration Act. (§ 1280 et seq.) The purpose of the act is to promote *contractual arbitration*, in accordance with this policy, as a more expeditious and less expensive means of resolving disputes than by litigation in court. (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 342 [79 Cal.Rptr.2d 308, 965 P.2d 1178].) "Typically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts." (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 402, fn, 5 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109].)

---

[27]O'Dowd also raises other arguments that we need not address in view of the conclusion which we reach in this matter. For example, we have no need to consider O'Dowd's argument that Hightower's acceptance of the funds tendered on October 13, 2000, constituted an acceptance of benefits that compels dismissal of Hightower's writ petition. We therefore will deny as moot O'Dowd's motion to dismiss filed herein on October 30, 2000.

Thus, it is clearly the expectation of the parties to an arbitration agreement that the arbitrator's decision will be both binding and final. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).) "This expectation of finality strongly informs the parties' choice of an arbitral forum over a judicial one. The arbitrator's decision should be the end not the beginning of the dispute." (*Id.* at p. 10.) "Ensuring arbitral finality thus requires that judicial intervention in the arbitration process be minimized. [Citations.] Because the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels, arbitral finality is a core component of the parties' agreement to submit to arbitration. Thus, an arbitration decision is final and conclusive *because the parties have agreed that it be so*. By ensuring that an arbitrator's decision is final and binding, courts simply assure that the parties receive the benefit of their bargain." (*Id.* at p. 10, italics in original, fn. omitted.)

 This principle of arbitral finality results in a broad authority to the arbitrator to decide cases in a way that might not be justified in a court of law. " '[A]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action.' [Citations.] As early as 1852, this court recognized that, 'The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].' [Citation.] 'As a consequence, arbitration awards are generally immune from judicial review. "Parties who stipulate in an agreement that controversies that may arise out of it shall be settled by arbitration, may expect not only to reap the advantages that flow from the use of that nontechnical, summary procedure, but also to find themselves bound by an award reached by paths neither marked nor traceable and not subject to judicial review." [Citation.]' [Citation.]" (*Moncharsh, supra*, 3 Cal.4th at pp. 10-11.)

Based upon these legal authorities and principles, the *Moncharsh* court concluded that, with narrow exceptions not applicable here, "an arbitrator's decision cannot be reviewed for errors of fact or law. In reaffirming this general rule, we recognize there is a risk that the arbitrator will make a mistake. That risk, however, is acceptable for two reasons. First, by voluntarily submitting to arbitration, the parties have agreed to bear that risk in return for a quick, inexpensive, and conclusive resolution to their dispute. . . . [¶] . . . [¶] A second reason why we tolerate the risk of an erroneous decision is because the Legislature has reduced the risk to the parties of such a decision by providing for judicial review in circumstances

involving serious problems with the award itself, or with the fairness of the arbitration process." (*Moncharsh, supra,* 3 Cal.4th at pp. 11-12.) To put it another way, even "an award reached by an arbitrator pursuant to a contractual agreement to arbitrate is not subject to judicial review except on the grounds set forth in sections 1286.2 (to vacate) and 1286.6 (for correction).[28] Further, [even] the existence of an error of law apparent on the face of the award that causes substantial injustice does not provide grounds for judicial review." (*Moncharsh, supra,* at p. 33.)

 Such principle of arbitral finality, however, does not preclude the arbitrator from making a *final* disposition of a submitted matter in more than one award. Nor does section 1283.4 (see fn. 18, *ante*), upon which Hightower so heavily relies, compel such a result. The cases relied upon by Hightower do not hold otherwise.[29]

---

[28]Section 1286.2 sets forth the grounds for vacation of an arbitrator's award. It states in pertinent part: "[T]he court shall vacate the award if the court determines [that]: [¶] (a) The award was procured by corruption, fraud or other undue means; [¶] (b) There was corruption in any of the arbitrators; [¶] (c) The rights of the party were substantially prejudiced by misconduct of a neutral arbitration; [¶] (d) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted[; or] [¶] (e) The rights of such party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title."

In addition, section 1286.6 provides grounds for correction of an arbitration award. That section states in pertinent part: "[T]he court, unless it vacates the award pursuant to Section 1286.2, shall correct the award and confirm it as corrected if the court determines that: [¶] (a) There was an evident miscalculation of figures or an evident mistake in the description of any person, thing or property referred to in the award; [¶] (b) The arbitrators exceeded their powers but the award may be corrected without affecting the merits of the decision upon the controversy submitted; or [¶] (c) The award is imperfect in a matter of form, not affecting the merits of the controversy."

[29]In *Elliott & Ten Eyck Partnership v. City of Long Beach* (1997) 57 Cal.App.4th 495 [67 Cal.Rptr.2d 140], the arbitrator issued a "supplemental" award that modified portions of the initial award and added new provisions thereto; in short, the supplemental award "effected a substantive change in the award." (*Id.* at p. 502.) The court held that, unlike a sitting judicial officer, an arbitrator had no such power. (*Ibid.*; §§ 1284, 1286.6, subds. (a) & (c).) This, of course, is not what happened here. The remedy fashioned by the arbitrator in this case necessarily required utilization of an incremental award process; it did not involve a correction or modification of the original award as was the case in the *Elliott & Ten Eyck* decision.

Hightower also cites *Dickens v. Lee* (1991) 230 Cal.App.3d 985 [281 Cal.Rptr. 783] as supportive of his position. However, *Dickens* is a *judicial* arbitration case and presents no issues arising from, nor is it useful in construing, implementing, or applying, the *contractual* arbitration statutes. (§ 1280 et seq.)

In *M.B. Zaninovich, Inc. v. Teamster Farmworker Local Union 946* (1978) 86 Cal.App.3d 410 [150 Cal.Rptr. 233], the arbitrator's award failed to include a ruling on the critical issue of how much money was owing to the defendant union and was silent as to the number of employees who had authorized paycheck deductions for union initiation fees and dues, the

What is mandated by statutory and case law is that the arbitrator decide *all* of the submitted issues and that such decision, once rendered, may be subject to judicial review, only upon certain limited conditions not here applicable. This does not come close to foreclosing the utilization of a multiple incremental or successive award process as a means, *in an appropriate case,* of finally deciding *all* submitted issues. As we now explain, the arbitrator's broad remedy power informs our understanding of the proper interpretation and application to be given to the principle of arbitral finality and the mandate of section 1283.4.

### 2. *An Arbitrator Has Broad Power to Fashion an Appropriate Remedy*

█ The limitations placed on judicial review and oversight of an arbitration award have resulted in a substantial deference to the arbitrator's own assessment of his or her authority to resolve an issue. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372-373 [36 Cal.Rptr.2d 581, 885 P.2d 994] (*Advanced Micro*).) "[C]ourts should generally defer to an arbitrator's finding that determination of a particular question is within the scope of his or her contractual authority." (*Id.* at p. 372.) Section 1283.4 states that an arbitrator's written award shall determine all submitted questions "necessary in order to determine the controversy." It is, however, for the arbitrator to determine what issues are "necessary" to the ultimate decision. (*Morris v. Zuckerman* (1968) 69 Cal.2d 686, 690 [72 Cal.Rptr. 880, 446 P.2d 1000].)

The same deference extended to an arbitrator's determination as to the *scope* of his or her authority also applies to the arbitrator's *choice of a remedy.* (*Advanced Micro, supra,* 9 Cal.4th at p. 381.) "In providing for judicial vacation or correction of an award, our statutes (§§ 1286.2, subd. (d), 1286.6, subd. (b)) do not distinguish between the arbitrators' power to decide an issue and their authority to choose an appropriate remedy; in either

---

dates of such authorizations and the total amount of such deductions. The court properly concluded that the award should be vacated because it clearly had failed to resolve submitted issues, "the decision of which [were] necessary in order to determine the controversy." (*Id.* at pp. 413-415.) Again, this case is of no help to Hightower as it rests upon a patent failure by · the arbitrator to decide a submitted issue. The Partial Final Award before us cannot fairly be charged with such an omission. The only "unresolved" issues were those potential conditional issues that could only arise *after* the partial final award had been confirmed and the required actions of the parties thereunder had or had not occurred.

Finally, in *Banks v. Milwaukee Ins. Co.* (1966) 247 Cal.App.2d 34 [55 Cal.Rptr. 139, 36 A.L.R.3d 933], the arbitrator filed a "correction" to the initial award that purported to substantially alter the award by adding an award of general damages, which had been omitted from the arbitrator's decision as originally filed. For all of the reasons mentioned above in our discussion of the *Elliott & Ten Eyck* opinion, the decision of the *Banks* court provides no assistance to Hightower.

instance the test is whether the arbitrators have 'exceeded their powers.' Because determination of appropriate relief also constitutes decision on an issue, these two aspects of the arbitrators' authority are not always neatly separable." (*Id.* at p. 373.)

In *Morris v. Zuckerman, supra,* 69 Cal.2d 686, the Supreme Court upheld an arbitrator's choice of relief against the argument that the relief granted exceeded the arbitrator's contractual authority. The plaintiff had argued that the arbitrator had no authority to add conditions to a contract for the sale of jointly owned land. The court held that the arbitrator could do so if equity and the parties' relationship, one to the other, required such relief. "In reaching this conclusion [*Morris*] applied a rule of substantial deference to the arbitrators' jurisdictional determinations. (*Morris v. Zuckerman, supra,* 69 Cal.2d at p. 690.) *Morris* thus implies an arbitrator's discretion to determine the extent of remedies is as great as his or her discretion to determine the related question of what issues are necessary to the decision." (*Advanced Micro, supra,* 9 Cal.4th at p. 374.)

"Deference to the arbitrator is also required by the character of the remedy decision itself. Fashioning remedies for a breach of contract or other injury is not always a simple matter of applying contractually specified relief to an easily measured injury. It may involve, as in the present case, providing relief for breach of implied covenants, as to which the parties have not specified contractual damages. It may require, also as in this case, finding a way of approximating the impact of a breach that cannot with any certainty be reduced to monetary terms. Passage of time and changed circumstances may have rendered any remedies suggested by the contract insufficient or excessive. As the United States Supreme Court explained in the leading case on review of arbitral remedies in the collective bargaining context, the arbitrator is required 'to bring his informed judgment to bear to reach a fair solution of a problem. . . . There the need is for flexibility in meeting a wide variety of situations. The [drafters] may never have thought of what specific remedy should be awarded to meet a particular contingency.' [Citation.]" (*Advanced Micro, supra,* 9 Cal.4th at p. 374.)

"The choice of remedy, then, may at times call on any decisionmaker's flexibility, creativity and sense of fairness. In private arbitrations, the parties have bargained for the relatively free exercise of those faculties. Arbitrators, unless specifically restricted by the agreement to following legal rules, ' "may base their decision upon broad principles of justice and equity . . . ." [Citations.] . . . .' . . . Were courts to reevaluate independently the merits of a particular remedy, the parties' contractual expectation of a

decision according to the arbitrators' best judgment would be defeated." (*Advanced Micro, supra,* 9 Cal.4th at pp. 374-375, fn. omitted.)[30]

Thus, the *Advanced Micro* court concluded, the "principle of arbitral finality, the practical demands of deciding on an appropriate remedy for breach, and the prior holdings of this court all dictate that arbitrators, *unless expressly restricted by the agreement or the submission to arbitration,* have substantial discretion to determine the scope of their contractual authority to fashion remedies, and that judicial review of their awards must be correspondingly narrow and deferential." (*Advanced Micro, supra,* 9 Cal.4th at p. 376, italics added.)

The question remained, however, as to the standard to be applied to such judicial review of a selected remedy. The *Advanced Micro* court noted that a number of California appellate cases have applied one of two tests. The arbitrator's remedy selection would be sustained *unless* that remedy constituted an (1) "arbitrary remaking" or (2) a "completely irrational" construction of the contract. (*Advanced Micro, supra,* 9 Cal.4th at pp. 376-377.) In addition, the *Advanced Micro* court looked to several federal cases (primarily involving collective bargaining contracts and disputes), that had concluded an award was legitimate only so long as it drew "its *essence*" from the agreement. (See *Steelworkers v. Enterprise Corp.* (1960) 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424].) "Judicial review of remedies as outlined in the *Enterprise* decision thus looks not to whether the arbitrator correctly *interpreted* the agreement, but to whether the award is drawn from the agreement *as the arbitrator interpreted it* or derives from some extrinsic source. As the court explained in a later labor case, where an arbitrator is authorized to determine remedies for contract violations, 'courts have no authority to disagree with his honest judgment in that respect. . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.' [Citation.]" (*Advanced Micro, supra,* 9 Cal.4th at p. 378, italics in original.)

■ After reviewing these authorities, the *Advanced Micro* court distilled what it believed was "a meaningful, workable and properly deferential framework for reviewing an arbitrator's choice of remedies. Arbitrators are not obliged to read contracts literally, and an award may not be vacated

---

[30]The *Advanced Micro* court cautioned, however, that it did not mean to suggest that an arbitrator's exercise of discretion in ordering relief was unrestricted or unreviewable. "The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate. [Citation.] Awards in excess of those powers may, under sections 1286.2 and 1286.6, be corrected or vacated by the court." (*Advanced Micro, supra,* 9 Cal.4th at p. 375.)

merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.] *The remedy awarded, however, must bear some rational relationship to the contract and the breach.* The required link may be [1] to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), [2] to an interpretation implied in the award itself, or [3] to a plausible theory of the contract's general subject matter, framework or intent. [Citation.] The award must be related in a rational manner to the breach (as expressly or *impliedly* found by the arbitrator). Where the damage is difficult to determine or measure, the arbitrator enjoys correspondingly broader discretion to fashion a remedy. [Citation.]" (*Advanced Micro, supra,* 9 Cal.4th at p. 381, fn. omitted, italics added.) "*In close cases the arbitrator's decision must stand.*" (*Ibid.*, italics added.)·

Thus, "[t]he award will be upheld so long as it [is] even arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source." (*Advanced Micro, supra,* 9 Cal.4th at p. 381.) Unless expressly restricted by the parties' agreement, an arbitrator has the authority to fashion such relief as he or she considers just and fair under the circumstances existing at the time of the arbitration, "*so long as the remedy may be rationally derived from the contract and the breach.*" (*Id.* at p. 383, italics added.) As the Supreme Court later put it, "an arbitrator's choice of relief does not exceed his or her powers so long as it 'bears a rational relationship *to the underlying contract as interpreted, expressly or impliedly, by the arbitrator* and to the breach of the contract found, expressly or impliedly, by the arbitrator' [Citation.]" (*Moshonov v. Walsh* (2000) 22 Cal.4th 771, 777 [94 Cal.Rptr.2d 597, 996 P.2d 699], italics added.)

We now apply these principles to the Partial Final Award issued by the arbitrator in this matter.

### 3. *The Arbitrator Had Authority to Issue a Partial or Interim Award and to Reserve Jurisdiction to Issue a Final Award on the Remaining Issues*

In this case, the parties agreed to arbitrate "any dispute" arising under the Shareholders Agreement. They also provided that the rules of the

AAA would apply.[31] Those rules, consistent with the principles articulated by *Moncharsh* and *Advance Micro,* stated that the "arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." (AAA, Commercial Arbitration Rules (1996) rule 43.) This rule has been described as a broad grant of authority and gives the arbitrator a *"broad scope"* in his or her choice of relief. (*Moore v. First Bank of San Luis Obispo* (2000) 22 Cal.4th 782, 786-787 [94 Cal.Rptr.2d 603, 996 P.2d 706].)

The arbitrator determined that Hightower had breached the Shareholders Agreement and had thereby frustrated O'Dowd's attempt to complete the purchase of Hightower's shares in Green Hills pursuant to O'Dowd's $47 million offer on June 26, 1998. Under the terms of the Shareholders Agreement, O'Dowd was entitled to complete that purchase by September 24, 1998. The arbitrator found that he was unable to do so due to Hightower's breach. Thus, the arbitrator had to fashion a remedy that would give O'Dowd the "benefit of his bargain." This was no simple matter because (1) the financing that O'Dowd had arranged, and which was available in September 1998, was no longer available and (2) it was not at all clear that O'Dowd would be able, nearly two years later, to make a comparable deal. Thus, in the arbitrator's words, it was his task to construct an award that would "provide [O'Dowd] the benefit of the prior deal as closely *as that may now be approximated."* (Italics added.)

The arbitrator determined that O'Dowd was entitled to a new opportunity to acquire Hightower's shares at the same price, less certain deductions for the costs of his new financing and his litigation expenses. In order to make this opportunity meaningful, O'Dowd would necessarily have to be given a reasonable opportunity to obtain such new financing. To accomplish this, the arbitrator provided that O'Dowd would have the right, but not the obligation, to purchase, upon certain designated conditions, Hightower's shares *within six months of the date of the confirmation* of the award (which, as already noted, the arbitrator designated as a Partial Final Award).

Obviously, this option would be of no value to O'Dowd unless it were a firm and final right. Without assurance that O'Dowd's legal right to make the purchase was finally resolved, it would be difficult to obtain the new financing, and enforcement of the option rights would be subject to continuing uncertainty. "[A]n arbitration award is not a judgment having the same

---

[31]As we have already noted, the rules referred to are those in effect on August 24, 1998, when Hightower made his written demand for arbitration. (See fns. 2 and 8, *ante.*) It is those rules to which we look.

force and effect as a judgment in a civil action until it is confirmed [citations] and . . . until it is confirmed it has only the same force and effect as a contract in writing between the parties to the arbitration [citations] . . . ." (*Trollope v. Jeffries* (1976) 55 Cal.App.3d 816, 822 [128 Cal.Rptr. 115]; § 1287.6.) It was obviously for this reason that the arbitrator expressly provided that his Partial Final Award would be subject to confirmation while, at the same time, he reserved jurisdiction to make a final award settling all remaining issues not capable of resolution until *after* O'Dowd had exercised his option and completed the necessary preparations to complete the purchase of Hightower's shares. A number of actual and potential unresolved issues were described in the Partial Final Award.

We view this incremental process structured by the arbitrator as reasonably necessary, if not essential, to the effective establishment and enforcement of the remedy that the arbitrator has fashioned. We find no violation of section 1283.4, as argued by Hightower. The arbitrator has not improperly left undecided issues "necessary in order to determine the controversy." Rather, he has determined all issues that are necessary to the resolution of the essential dispute arising from Hightower's breach. The arbitrator's judgment on this point must be respected. (*Advanced Micro, supra,* 9 Cal.4th at pp. 367, 372-374; *Morris v. Zuckerman, supra,* 69 Cal.2d at p. 690.) Nothing remains to be resolved except those potential and conditional issues that necessarily could not have been determined on April 25, 2000, when the Partial Final Award was issued.[32]

Thus, the arbitrator's choice of a remedy must be viewed as including this incremental or multistep process involving an initial and a final award, both of which would be subject to confirmation by the court. In order to sustain the Partial Final Award, it is only necessary that we find a link between relief granted in the award and the contractual terms of the Shareholders Agreement as (1) actually interpreted by the arbitrator or (2) an interpretation implied in the award itself or (3) a plausible theory of the contract's general subject matter, framework or intent. (*Advanced Micro, supra,* 9 Cal.4th at p. 381.) We have no trouble finding the required link in this case.

The Shareholders Agreement contained reciprocal buy-sell provisions giving each party an opportunity to buy out the other under conditions that necessarily involved uncertainties as to who would ultimately succeed, the final sale price, how much time the sale would take to complete and what financing could be obtained: A breach by one party, as occurred here, could

---

[32]See, e.g., footnote 25, *ante.*

only be effectively remedied by giving the injured party a fair opportunity to restructure the purchase that the other's wrongful conduct had aborted. To provide such fair opportunity it was, as we have said, reasonable and appropriate, if not essential, that the arbitrator adopt the incremental award process reflected in the partial final award. Because of the particular terms of the parties' contract and the conditional obligations assumed by them, it could be concluded that they impliedly consented to this remedial process produced by the arbitrator. In any event, it is certainly clear that such a remedy choice by the arbitrator " 'bears a rational relationship to the underlying contract as interpreted, expressly or impliedly, by the arbitrator . . . .' " (*Moshonov v. Walsh, supra,* 22 Cal.4th at p. 777.)

Hightower insists, however, that if we sanction such an incremental award process we necessarily will place him in a "judicial limbo" where he would be unable to effectively seek appellate review of any determination made by an arbitrator in an initial or partial award and that as a result he would sustain substantial prejudice. We reject this argument since any partial award, as we have already noted, would be subject to confirmation. Upon such confirmation, it will be appropriate for the trial court to issue an interlocutory judgment establishing, in accordance with the terms of such award, the issues and matters resolved thereby and providing a basis and means for the judicial enforcement thereof. (See generally *Rubin v. Western Mutual Ins. Co.* (1999) 71 Cal.App.4th 1539, 1545-1548 [84 Cal.Rptr.2d 648].) Appellate relief from such judgment, as is true with respect to interlocutory judgments generally, would be available by application for an extraordinary writ. The granting of appellate relief at this stage, however, would, as in all such cases, require a proper showing of justification for immediate appellate intervention; in other words, the aggrieved party would have to make a demonstration as to why an appeal from the judgment confirming the ultimate final award would not be adequate. (See generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1999) ¶¶ 15:1.2 to 15:6.5.) If such a showing is made, however, the appellate court could consider issues relating to the validity of any partial award under all relevant statutory and decisional authority. Thus, if Hightower can demonstrate the necessary prejudice arising from a delay in appellate review of any interlocutory judgment confirming the partial final award, he would be entitled to seek appropriate relief.[33]

We therefore hold that the arbitrator's Partial Final Award was entirely proper, even though there remained a number of potential and conditional

---

[33]This judicial process is necessarily required by our recognition of the validity of an incremental award procedure *in appropriate cases,* and is entirely consistent with section 1287.4, which provides: "If an award is confirmed, judgment shall be entered in conformity therewith. The judgment so entered has the same force and effect as, and is subject to all the provisions of law relating to, a judgment in a civil action of the same jurisdictional

issues that the arbitrator will have to address in a final order in order to give total and complete relief to O'Dowd and to enforce Hightower's rights under the Partial Final Award. This process does not offend section 1283.4 or any other statutory provision; nor was it precluded by the terms of the Shareholders Agreement or the rules applicable to the arbitration.[34] Indeed, as we have suggested, it was impliedly authorized by that agreement (or at least the arbitrator could reasonably so conclude) and it is consistent with the "broad authority" granted by the applicable rules.[35]

## DISPOSITION

The order to show cause issued on September 27, 2000, is discharged. A peremptory writ of mandate shall issue directing the trial court, in accordance with section 1286 (see *Louise Gardens of Encino Homeowners' Assn., Inc. v. Truck Ins. Exchange, Inc., supra,* 82 Cal.App.4th at pp. 658, 660), to supplement its order of June 27, 2000, which denied Hightower's petition to vacate the Partial Final Award by adding to such order a further order confirming that award. An appropriate interlocutory judgment should then be entered thereon and an order made sending the matter back to the arbitrator for such further proceedings as may be required to permit the issuance of a final award resolving all remaining issues. The motion of O'Dowd, dated October 30, 2000, to dismiss Hightower's petition for a writ

---

classification; and it may be enforced like any other judgment of the court in which it is entered, in an action of the same jurisdictional classification."

[34]It is apparent that complex commercial disputes are increasingly being submitted to arbitration for resolution and the process which we sanction here has already received express recognition and acceptance. The AAA's Commercial Dispute Resolution Procedures, amended and effected on January 1, 1999 (which replaced the rules directly applicable to this case), provide in subdivision (b) of rule R-45, entitled "Scope of Award": "In addition to a *final* award, the arbitrator may make *other* decisions, *including interim, interlocutory, or partial* rulings, orders and *awards*. In any interim, interlocutory, or partial award, the arbitrator *may* assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate." We also note that such a procedural process is effectively recognized and sanctioned under the Federal Arbitration Act (9 U.S.C. § 1 et seq.). (*Pacific Reinsurance v. Ohio Reinsurance* (9th Cir. 1991) 935 F.2d 1019, 1022-1023; *Metallgesellschaft A. G. v. M/V Capitan Constante* (2d Cir. 1986) 790 F.2d 280, 282-283.)

[35]Hightower has also argued that since the arbitrator was obligated to issue an award within 30 days of the close of the hearing, he is without power to reserve jurisdiction over unresolved issues that would necessarily be resolved beyond such 30-day period. This argument is summarily rejected. It simply begs the larger question that we have already addressed: Does an arbitrator have the authority in a proper case to fashion a remedy which utilizes partial or interim awards? Because we have answered that question in the affirmative, we need say no more.

of mandate, is denied as moot.[36] Each party shall bear their own costs in this writ proceeding.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 28, 2001, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied May 16, 2001.

---

[36]See footnote 27, *ante*. We also do not address any issues relating to the arbitrator's determination that Hightower was entitled to relief on his claim for reformation of Green Hills's articles. In view of the result we reach and the fact that Hightower's shares have been transferred and cancelled, any question of reformation is now moot.