[No. G036999. Fourth Dist., Div. Three. Jan. 31, 2007.]

JEFFREY S. ROEHL et al., Plaintiffs and Respondents, v.
MARIANA RITCHIE, Defendant and Appellant;
KENNETH J. CUMMINS, as Trustee, etc., Defendant and Respondent.

## Counsel

Rutan & Tucker, Theodore I. Wallace, Jr., and Treg A. Julander for Defendant and Appellant.

Goldstein, Gellman, Melbostad, Gibson & Harris and Paul H. Melbostad for Plaintiffs and Respondents.

Bidna & Keys, Howard M. Bidna and Jon A. Longerbone for Defendant and Respondent.

## Opinion

**SILLS, P. J.**—An arbitrator cannot amend an award after the trial court has confirmed it. We articulated that "reasonable, bright-line test" in *Delaney v. Dahl* (2002) 99 Cal.App.4th 647, 659 [121 Cal.Rptr.2d 663] (*Delaney*), and will not redraw it here.

The judgment below passes the *Delaney* test.

Here, an arbitrator in a trust dispute issued a first award that effectively decided the most important dispute between the parties, involving whether a corporate note was separate or community property. While the arbitrator referred to the distribution values in a trial exhibit (exhibit 20), he did not

make the exhibit a part of the award. Instead, he expressly left open his options to work with the trustee to make a different distribution if "in light of new developments" a "somewhat different distribution of assets would benefit the estate."

Appellant never sought to modify or amend the first award. To the contrary, it was appellant who sought to confirm it in its original form, and to secure an affirmance on appeal. In this specific factual context, the arbitrator was free to conduct an incremental or multistep process as part of his choice of a remedy, and to issue a second award.

By seeking to confirm (and affirm) an open-ended award, appellant effectively consented to further arbitration on the yet-to-be-resolved issues. As we were aptly reminded by counsel at oral argument (quoting baseball great Yogi Berra), " 'It ain't over till it's over.' "

We affirm the trial court's judgment confirming the second award. The arbitrator did not revisit previously determined matters. Instead, both the arbitrator and the trial court respected the decisions reached in the first award.

If anything is confirmed by the instant appeal, it is the significance of the process of confirming an arbitration award. The time to make sure that the i's are dotted, t's are crossed, and that the award decides all necessary issues in a single, final and self-contained award is *before* the award is confirmed, not *after*. That is the best way to ensure that an arbitrator's decision is truly "the end, not the beginning, of the dispute." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).)

I

The Roehl Family Trust (Trust) was created by Ernest O. Roehl (Husband) and Diana Roehl (Wife), who were married for some 18 years. Wife, who had multiple sclerosis and was in poor health, died two years after Husband.

Appellant Mariana Ritchie (Niece) is Wife's niece, and beneficiary, and the executor of her estate. Respondents Jeffrey Roehl and William Roehl (Sons) are Husband's sons from a previous marriage. Niece and Sons dispute the distribution of the Trust's assets.

This litigation antedates Wife's death and involves two separate arbitration awards, each of which has been confirmed by the superior court. Niece

successfully moved to confirm the first arbitration award, which Sons appealed, and which judgment we affirmed in an unpublished opinion. Sons successfully moved to confirm the second arbitration award, which Niece now appeals. Niece contends that the arbitrator had no jurisdiction to make the second award after the trial court confirmed the first.

A detailed chronology follows.[1]

### A. *The First Arbitration Award (March 1, 2004).*

Husband died in March 2000. The family's estate plan called for the Trust assets to be distributed into three separate subtrusts. Wife was the sole beneficiary of the Survivor's Trust, while Sons were the beneficiaries of the two other subtrusts, the Qualified Income Trust and Decedent's Trust.

Relations among the beneficiaries became intensely antagonistic, resulting in disputes about trust administration, and ultimately litigation. The trial court ordered the matter submitted to binding arbitration pursuant to the Trust agreement, which contained an arbitration clause.[2]

In January 2003, Retired Judge James A. Jackman was appointed as the arbitrator.[3] A two-day arbitration hearing was held in January 2004. Respondent Kenneth Cummins, recently appointed as the trustee, did not participate.

On March 1, 2004, the arbitrator issued his eight-page award. The arbitrator resolved the "biggest dispute"—characterization of the "Rho-Chem note"[4]—in Wife's favor. "Having determined that the Rho-Chem stock was community property at date of death, the single biggest issue before the arbitrator is resolved."

---

[1] In discussing the procedural history, we disregard Sons' respondents' appendix. Sons made no effort to show that the documents contained in their appendix were filed in the superior court. (Cal. Rules of Court, rules 8.120(b)(3)(A), 8.124(d)(1).) Properly authenticated copies of these documents were contained in the appendix filed by respondent Kenneth Cummins.

[2] The arbitration clause provided for mandatory arbitration "[i]n the event of a dispute arising under this Trust Agreement, including, without limitation, any dispute arising after the death of the Survivor concerning any allocation or apportionment of Trust assets . . . ." The arbitration clause further provided that the arbitration should take place "under the auspices and pursuant to the rules of the arbitrator."

[3] Judge Jackman previously had served as presiding probate judge for the superior court and was, in Niece's counsel's words, a "logical choice."

[4] The Rho-Chem note was a contractual obligation of Cemex Corporation requiring the payment of monthly interest to the Trust.

The arbitrator proceeded to consider several "subordinate issues still to be decided." He denied the attorney fees request by Sons' counsel. He determined that the family home in Huntington Harbour should be split as 75 percent Wife's separate property and 25 percent Husband's separate property. He also decided that it should be apportioned to the Survivor's Trust because Wife "continues to occupy that residence as her home."

The arbitration award referred to exhibit 20, an arbitration exhibit prepared by Roger Cannon, a certified public accountant, detailing the trust assets, and entered into evidence by Wife. The arbitrator specifically approved the allocation in exhibit 20 "at least to the extent of its distribution of the Rho-Chem asset."

The arbitrator equivocated whether the other Trust assets (such as the family home) should be distributed in the manner suggested in exhibit 20 or whether there should be a "somewhat different distribution of assets . . . ." The arbitrator stated: "It may be in light of developments since November 30, 2003 [the valuation date of the assets listed in exhibit 20] that some of the other assets should be apportioned differently than shown here. *If in light of new developments since then, a somewhat different distribution of assets would benefit the estate, the trustee may modify said distribution.*" (Italics added.)

The arbitrator expressed his willingness "to work with the trustee to review any remaining questions he may have concerning the orders and findings made by the arbitrator." The arbitrator concluded that exhibit 20 "is to become" the distribution of trust assets "[t]o the extent that changes are not needed, in the opinion of the trustee . . . ." Exhibit 20 was not attached to the award.

On March 7, 2004, within a week of the award, Wife died. Niece succeeded to Wife's interests and continued to be represented by Wife's counsel.

In the succeeding months, Sons wrote to the arbitrator to request that he reconsider before issuing a final decision on the Trust administration disputes. Sons challenged the decision on the Rho-Chem note, and any use of the asset allocation tables in exhibit 20. Sons urged the arbitrator to reconsider his denial of their attorney fees request.

The arbitrator responded on May 30, 2004. As to the family home, the arbitrator stated, "[I] do not feel that I have sufficient evidence to rule on that at this time other than to the extent that I tentatively accepted the distribution introduced [in exhibit 20] which showed how a possible appropriate distribution could be made in light of a finding of Rho-Chem as community. I had no other such proposed allocation before me and it is clear from my holding that I was willing to reexamine that if appropriate."

On June 8, 2004, Sons filed a petition with the superior court "to preserve their rights to have the Award vacated." They argued that the arbitrator exceeded his powers by acting contrary to the Trust provisions.

On June 11, 2004, the arbitrator wrote a short letter to the parties, stating, "After thinking of the various issues, I believe that the appropriate approach at this time is to leave the distribution as originally done. My reasoning, for whatever it's worth, is based on the notion that it was the best decision [that] could be made in light of the evidence that was introduced at the time of trial."

On June 15, 2004, Niece filed her opposition and separately moved to confirm the March 1 award. Niece never asked the arbitrator to amend, correct or modify the award, or to issue a final award that formally incorporated exhibit 20. Her motion to confirm did not mention the arbitrator's June 11 letter, or seek to have it considered as an amendment or correction of the award.

On July 23, 2004, the trial court (Judge Marjorie Laird Carter) denied the petition, and issued a judgment confirming the March 1 award. The court found no evidence that the arbitrator exceeded his authority.

B. *The First Appeal (September 28, 2005).*

In September 2004, Sons appealed from the judgment confirming the first arbitration award. They filed their appellants' opening brief seven months later.[5]

The appeal made a hodgepodge of challenges to the award, including ill-fated efforts to argue that the arbitrator exceeded his powers and failed to follow agreed-upon procedures. Sons relied upon numerous documents which postdated their notice of appeal.

---

[5] We take judicial notice of our records and files in the first appeal in *Roehl v. Ritchie*, September 28, 2005, G034502 (nonpub. opn.). (Evid. Code, §§ 452, subd. (e)(1), 459.)

Niece's brief pointed out that such "evidence" was outside the appellate record and should be ignored: "Put simply, the post-judgment events upon which Appellants *exclusively* rely in their appeal are irrelevant to and cannot be considered in this Court's de novo review of the trial court's July 2004 judgment."

We agreed with Niece in an unpublished opinion. (*Roehl v. Ritchie, supra,* G034502).) We stressed its narrow basis: "Appellants seek to reverse a judgment confirming an arbitration award based *solely* on unauthenticated postjudgment 'evidence' that is outside the record on appeal and that was never considered by the trial court. This we cannot do. Appellants have made no other attempt to establish any viable grounds for vacating the arbitration award under Code of Civil Procedure section 1286.2." (*Ibid.,* italics added.) We refused to scour the record for other error: "It is up to appellants to frame the issues on appeal and to furnish an appropriate record for appellate review of trial court error. 'This court is not inclined to act as counsel for . . . any appellant and furnish a legal argument as to how the trial court's rulings in this regard constituted an abuse of discretion.' " (*Ibid.*)

## C. *The Second Arbitration Award (October 28, 2005).*

On November 15, 2004, during the pendency of the appeal, the trustee submitted his first of two petitions for instruction to the arbitrator. The trustee stated that he did not seek to reconsider the "important issues" decided in the first arbitration award, but instead raised other "open" issues "which need to be resolved prior to distribution of the trust assets." The trustee specifically petitioned for instructions on a number of undecided issues, including the date on which the Huntington Harbour house was to be valued. As the trustee put it, "It is 'a given' that the [the Huntington Harbour house] is to be allocated to the Survivor's Trust. Is it to be allocated at the value of $575,000, as Exhibit 20 refers to a Schedule of Distribution of Assets as of 11/30/03, which is arguably a deemed distribution, or is [it] to be valued as of the date of actual distribution? If it is to be valued as of the date of actual distribution, the Trustee needs that date and authority to employ at Trust expense a certified real estate appraiser or a MAI appraiser to appraise the same."

Niece objected to any effort by the Arbitrator to change the valuation of the Huntington Harbour house from that stated in exhibit 20. "[T]he Arbitrator should simply instruct [the trustee] that the matter already has been decided

and should instruct [the trustee] to allocate and distribute the assets in accordance with Exhibit 20." Niece, however, did ask the arbitrator to order a new accounting because of ongoing transactions and expenses, and to instruct the trustee "how he should charge any cash shortfall."

In January 2005, the trustee submitted a second petition for instructions to the arbitrator. The second petition for instructions concerned claims that had been filed by various entities and persons against the Trust. These included claims by Niece and her husband for reimbursement for money paid to Wife's caregivers. The trustee asked the arbitrator to determine whether these claims should be allowed, and if so, in what amounts and how they should be allocated among the subtrusts.

On October 28, 2005, the arbitrator issued the second arbitration award. The arbitrator accepted the new appraisal of the Huntington Harbour house, determined its fair market value (as of Wife's death) to be $1,050,000, and assigned it to the Survivor's trust.[6] The award included a table allocating Trust assets among the various subtrusts, and assigned an equalization value of $262,500 for Husband's 25 percent separate property interest. The arbitrator approved Niece's claims for reimbursement.

Unlike the first arbitration award, the second arbitration award specifically lists the allocation of assets among the various subtrusts. The arbitrator reserved jurisdiction to rule on the reasonableness of the trustee's fees, and issues relating to his accountings.

On November 14, 2005, Niece filed a motion to vacate the second arbitration award on the ground that the arbitrator no longer had jurisdiction under Code of Civil Procedure section 1284 to modify or amend it. Niece requested that the trial court order the trustee "to distribute the assets of the Survivor's Trust in accordance with the [first award] and arbitration Exhibit 20 referred to in the Award." Niece contended that the second arbitration award reduced the value of the Survivor's trusts from the exhibit 20 distribution values "by at least $267,620."

Sons opposed Niece's motion, and petitioned to confirm the second arbitration award.

---

[6] In contrast, exhibit 20 listed the Huntington Harbour house as valued at $575,000.

The trial court (Judge Johnston) held a hearing on February 23, 2006. On April 13, 2006, the court denied the motion to vacate and confirmed the second arbitration award.

## II

It is important at the outset to make clear the judgment we are reviewing. This appeal arises from the judgment confirming the *second* arbitration award of October 28, 2005. We are *not* reviewing the judgment confirming the *first* arbitration award of March 1, 2004. That task was accomplished when we issued our unpublished decision in the first appeal. We do not revisit the propriety of the first arbitration award, but construe it only insofar as it affects our review of the second arbitration award. (See, e.g., *Patchett v. Bergamot Station, Ltd.* (2006) 143 Cal.App.4th 1390, 1395, fn. 2 [49 Cal.Rptr.3d 941] (*Patchett*).)

The second arbitration award is a final arbitration award that was confirmed by the superior court. Under Code of Civil Procedure section 1286.2,[7] we may vacate this final award only under "very limited circumstances." (*Delaney, supra*, 99 Cal.App.4th at p. 654.) We do not review the merits of the dispute, the sufficiency of the evidence, or the arbitrator's reasoning, nor may we correct or review an award because of an arbitrator's legal or factual error, even if it appears on the award's face. Instead, we restrict our review to whether the award should be vacated under the grounds listed in section 1286.2. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372–373 [36 Cal.Rptr.2d 581, 885 P.2d 994] (*Intel*); *Moncharsh, supra*, 3 Cal.4th at p. 11.) This means that we do not review the arbitrator's findings in the second award, but take them as correct. (*Intel, supra*, 9 Cal.4th at p. 367, fn. 1.)

Niece urges that we vacate the award on the grounds the arbitrator exceeded his powers when he "drastically modified a previous arbitration award long after his powers as arbitrator had expired." Niece contends that the second award "changed virtually every other ruling" in the first award.

In determining whether the arbitrator exceeded his powers in making the second arbitration award, we review the superior court's decision de novo, but we "pay substantial deference to an arbitrator's determination of his own authority." (*Delaney, supra*, 99 Cal.App.4th at p. 655.) Any doubts about the

---

[7] All statutory references are to the Code of Civil Procedure unless otherwise specified.

arbitrator's power to decide these issues must be resolved in his favor. (*Intel, supra*, 9 Cal.4th at pp. 372–373.) As the Supreme Court has explained, "arbitrators do not 'exceed[] their powers' within the meaning of section 1286.2, subdivision (d) and section 1286.6, subdivision (b) merely by rendering an erroneous decision on a legal or factual issue, so long as the issue was within the scope of the controversy submitted to the arbitrators." (*Moshonov v. Walsh* (2000) 22 Cal.4th 771, 775 [94 Cal.Rptr.2d 597, 996 P.2d 699].)

These statutory and common law limitations on our ability to vacate an arbitrator's decision further California's strong public policy of arbitral finality, with minimal judicial intervention. (*Delaney, supra*, 99 Cal.App.4th at p. 655.)

### A. Does the Second Arbitration Award Conflict with the First Arbitration Award?

Niece tells us that the second arbitration award must be vacated under the "bright-line" test in *Delaney* because it modified the first arbitration award, which already had been affirmed by Judge Carter, and affirmed by this court. According to Niece, "the law, facts, and strong public policy all dictate that the [first arbitration award] was final and that the Arbitrator had no jurisdiction to rewrite the entire Award 15 months after the trial court confirmed the Award." In her reply brief, Niece distilled the appeal to a single query, "At bottom, this appeal asks a simple question: can an arbitrator change his award after the trial court has confirmed the award."

In *Delaney*, we affirmed an arbitrator's power to *amend* the disposition section of an award shortly before confirmation to add the name of a corporate officer. Although the statutory time to *correct* the award had long passed, we affirmed the judgment confirming the amended award. We held the amended award was timely since it was made before confirmation. We stated, "The temporal requirement . . . —that the amendment must be made *before judicial confirmation of the award*—is a reasonable, bright-line test. To permit amendment until the trial court confirms the award furthers the policies set forth in *Moncharsh* and its progeny of ensuring finality of, and limiting judicial intervention in, the arbitration process." (*Delaney, supra*, 99 Cal.App.4th at p. 659, italics added.)

The Court of Appeal recently rejected a challenge to a second arbitration award on the grounds that it "vitiated" a first award previously made by the same arbitrator, which first award was confirmed by the trial court. In *Patchett,*

*supra*, 143 Cal.App.4th 1390, the arbitrator in a commercial property dispute determined that a tenant failed to meet his burden of proving that the common area maintenance charges imposed by the landlord were disproportionate to the charges paid by other tenants. But the arbitrator denied the request " 'without prejudice,' " and left the matter open for " 'another day.' " (*Id.* at p. 1393.) After confirmation, the arbitrator issued a second award where he found that the landlord's increase in maintenance charges was not justified. On appeal, the *Patchett* court found that the second award did not impermissibly alter or amend the first. (*Id.* at p. 1395, fn. 2.)

Exercising our de novo review of the judgment confirming the second arbitration award, but giving appropriate deference to the arbitrator's factual and legal findings, we have carefully scrutinized both the first arbitration award of March 1, 2004, and the second arbitration award of October 28, 2005. We cannot say that the latter modified the provisions of the former, and therefore was in excess of the arbitrator's powers.[8]

There can be no dispute about some key issues decided in the first arbitration award. Most notably, the arbitrator ruled in Wife's (now Niece's) favor on the most important question—who owned the Rho-Chem note. In like fashion, the arbitrator ruled that Wife (now Niece) would keep the Huntington Harbour house, and the arbitrator recognized that Husband (now Sons) only had a 25 percent separate property interest. The arbitrator determined that Sons' counsel could not recover his attorney fees from the Trust.

But there is nothing in the text of the first award that leads us to believe that it determined the value of all assets for purpose of distribution. The arbitrator recognized that other assets may be apportioned differently than as stated in exhibit 20 "in light of new developments" since November 30, 2003. The first award specifically left the door open for the trustee (who says he was unaware of the arbitration) to suggest modifications to the distribution in light of new developments that would benefit the estate, and for the arbitrator to "work with the trustee to review any remaining questions he may have concerning the orders and findings made by the arbitrator." As Judge Johnston stated at the hearing: "I looked at the arbitrator's award of March the 1st wherein I think that the language can reasonably be construed

---

[8] These matters were not decided in our opinion in the first appeal. We affirmed the judgment on the first arbitration award because of Sons' failure to present us with a proper record. We never purported to determine whether the first arbitration award decided all issues pending before the arbitrator, including the valuation and distribution of Trust assets.

as Judge Jackman saying I understand that there are additional issues that may come up. And I would like to reserve jurisdiction to deal with those as they come up."

We think that it is significant that the arbitrator did not incorporate the values expressed in exhibit 20 in his award. Nor did he attach exhibit 20 as an exhibit to the award, and incorporate it by reference in his decision. Plainly, the arbitrator left the matter up for future consideration. That is why he used the future conditional—exhibit 20 "is to become" the method for trust allocation *unless* the trustee determines that changes will be needed.

This is precisely what happened. The trustee filed two separate petitions for instructions regarding issues left open by the first arbitration award, and he brought up some new developments that had occurred since November 30, 2003. And the trustee appropriately enforced the provisions of the first arbitration award in his successful summary judgment against Sons' counsel's action for attorney fees.

Niece stresses that there is no evidence in the record regarding any post-November 30, 2003 changes. Not so. Anybody who lived in California during that period knows of the phenomenal boom in California residential real estate prices. This is particularly true for homes located near the coast, like the family home in Huntington Harbour.

The record bears this out. According to Niece, Roger Cannon apparently valued the Huntington Harbour house at $575,000 as of November 30, 2003, attributing an equalizing value of $143,750 for Sons' 25 percent interest. Yet a neutral appraisal some six months later (by the same appraiser who previously had valued the house) showed that the house was worth more than $1 million. The "new development" created by California's escalating real estate values increased Sons' equalizing interest to $262,500.

Niece has not provided us compelling reasons why we should restrict the arbitrator's power to make such factual determinations in the second arbitration award. The fact that the first award was judicially confirmed by the trial court only puts a judicial gloss on the first award; it does not add to or vary it. To borrow a bit of folk wisdom, a pig with lipstick is still a pig.

Under these circumstances, we defer to the arbitrator's powers to determine the scope of his contractual authority, and resolve any doubts in favor of upholding the second arbitration award. (*Intel, supra,* 9 Cal.4th at pp. 372–375; *Patchett, supra,* 143 Cal.App.4th at p. 1398.) Perhaps another

Yogi Berra quote best sums it up: " 'The umpire ain't ruled until he's ruled.' " (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1564 [55 Cal.Rptr. 682].)

### B. Did the First Arbitration Award, as Confirmed by the Trial Court, Allow the Arbitrator to Issue Incremental or Multistep Awards?

■ Niece challenges the arbitrator's power in the first arbitration to reserve jurisdiction to make incremental decisions. According to Niece, the arbitrator cannot intentionally leave any issues unresolved lest the first arbitration award be void under section 1283.4, which requires any arbitration award to "include a determination of *all the questions submitted* to the arbitrators the decision of which is necessary in order to determine the controversy." (Italics added) Niece says that California law permits arbitrators to reserve jurisdiction over postconfirmation disputes only in "very narrow circumstances not applicable here."

■ We disagree. In *Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1431 [104 Cal.Rptr.2d 209] (*Hightower*), the Court of Appeal rejected a very similar contention that section 1283.4 required a single final award that resolves *all* issues placed in dispute by the parties. *Hightower* relied heavily on the Supreme Court's decision in *Intel* and its deference to the arbitrator's choice of remedies. *Hightower* specifically affirmed an arbitrator's ability to use "a multiple incremental or successive award process as a means, *in an appropriate case,* of finally deciding *all* submitted issues." (86 Cal.App.4th at p. 1434.)

We recognize, as did *Hightower*, that there are limitations to such incremental awards, and that an arbitrator has no power to use the incremental award process to correct or modify the terms of an original award. (*Hightower, supra,* 86 Cal.App.4th at p. 1433, fn. 29, distinguishing *Elliott & Ten Eyck Partnership v. City of Long Beach* (1997) 57 Cal.App.4th 495 [67 Cal.Rptr.2d 140].) As we discussed above, the arbitrator's reservation of jurisdiction to issue a second arbitration award did not result in a correction or modification of the terms and provisions of the first arbitration award.

Niece questions why the arbitrator could not have resolved all the issues initially submitted to him in the first arbitration award. Niece claims that arbitrators—even in trust cases—should be compelled to "decide all issues submitted that are capable of resolution without an interim award." Otherwise, Niece urges, arbitrators would have "carte blanche to decide submitted issues piecemeal and to exercise continuing jurisdiction over any current and future disputes . . . ."

The time to make that challenge was in the first appeal, where the first arbitration award was directly before us. Far from doing so, Niece herself was the moving party in seeking to confirm the first arbitration award. As Niece persuasively argues in her opening brief, res judicata bars relitigation of the issues that could have been determined in the first appeal. (See also *Patchett, supra,* 143 Cal.App.4th at p. 1395, fn. 2 ["The first award was confirmed and is no longer subject to review"].)

■ At oral argument, Niece claimed that the *second* arbitration award violated a two-phase dispute resolution provision in the trust agreement, which Niece says required mediation as a prerequisite to further arbitration. (See *Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1508 [22 Cal.Rptr.3d 429] ["Mediation using a neutral professional is often an effective and efficient way to resolve legal disputes"].) Since Niece did not raise this issue in her opening brief, we do not consider whether the agreement imposed such a prerequisite, or its impact (if any) upon incremental arbitration proceedings. "Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge." (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 [43 Cal.Rptr.3d 148].)[9]

Finally, Niece challenges the second arbitration award for also reserving jurisdiction to make further supplemental awards. The arbitrator did reserve jurisdiction in the second arbitration award "until a future time" to determine "issues that relate to the accountings filed by [the trustee] (an accounting for the Qualified Income Trust, and an accounting for the Roehl Family Trust, which is an accounting for the Administrative Stage of the proceedings except for the Qualified Income Trust." The arbitrator also reserved jurisdiction to rule on the reasonableness of the trustee's fees and his attorney fees.

■ Arbitration awards may contemplate future proceedings. (*Hightower, supra,* 86 Cal.App.4th 1415; see also *Patchett, supra,* 143 Cal.App.4th at p. 1398 ["There is nothing irrational about agreeing to have all disputes decided by the same arbitrator, whose accumulation of information about the transaction and the parties may well present significant efficiencies redounding to the benefit of both parties"].) As the trustee points out, "the ongoing and changing nature of trust administration" may require ongoing proceedings "for instructions, to settle accounts, to fix compensation . . . [and] to allow, compromise or settle claims." The arbitrator did not abuse his discretion in fashioning a remedy to resolve ongoing matters relating to Trust administration costs and fees.

---

[9] We note also that Niece did not invoke the mediation provision in December 2004 when she asked the arbitrator to instruct the trustee how to charge costs, expenses and fees incurred during the course of the ongoing trust administration.

## C. *Should the Arbitrator's June 11, 2004 Letter Be Considered as Modifying, Correcting or Amending the First Arbitration Award?*

The nub of Niece's appeal is not the first arbitration award, which issued on March 1, 2004, and is clearly open-ended, but the arbitrator's one-page letter of June 11, 2004. In that letter, the arbitrator stated, "After thinking of the various issues, I believe that the appropriate approach at this time is to leave the distribution as originally done."[10]

References to the "key statements by the Arbitrator" in the June 11 letter permeate Niece's briefs and argument. "Even if the Award reserved jurisdiction over future questions, the Arbitrator expressly relinquished that power in his June 11 letter." "[T]he Arbitrator's June 11 letter, which Respondents ignore, unequivocally makes his Award final and terminates any 'reserved power' over changes to the Award or further litigation of the dispute."

Most critically, Niece relies upon the June 11 letter to support her assertion that the arbitrator "confirmed he had decided all issues presented, and *ordered distribution according to Exhibit 20 . . . .*" (Original italics.) "After the Arbitrator's June 11 letter, the Award unambiguously directed the distribution of Trust assets pursuant to Exhibit 20." Niece calls the June 11 letter a "final directive" and characterizes it as "equivalent to a finding that 'changes [were] not needed' . . . ."

There are fatal flaws to Niece's reliance on the June 11, 2004 letter. First, the June 11 letter does not "order" any distribution. Unlike the first arbitration award, the June 11 letter makes no reference to exhibit 20. It never describes itself as a "final directive," nor does it purport to make any findings. It contains the dangling qualifier "at this time." It has none of the trappings of a final amended arbitration award. It certainly cannot be considered as an order for final distribution of trust assets.

Second, and equally significant, the June 11 letter was *not* part of the first arbitration award, and was never sought to be confirmed as a correction or amendment to the original arbitration award. To the contrary, Niece's petition

---

[10] We quote the full text of the June 11, 2004 letter: "As Ms. Jarrell of our office has advised you, I have considered not only Mr. Melbostad's recent bullet points, but Mr. Wallace's response thereto. After thinking of the various issues, I believe that the appropriate approach at this time is to leave the distribution as originally done. My reasoning, for whatever it's worth, is based on the notion that it was the best decision they [*sic*] could be made in light of the evidence that was introduced at the time of trial. [¶] I believe that if Diana Roehl were alive today I would not make any changes, and it does not seem appropriate to begin tinkering with a judgment in light of after-discovered evidence. It is an undue burden on the parties to subject them to additional litigation when the original decision was based on a thorough presentation of the evidence by both sides."

to confirm the first arbitration award *only* referred to the award dated March 1, 2004. And while Niece's request to confirm contained some postaward correspondence as the attachments, the June 11 letter was not included. Niece never asked the arbitrator to incorporate the June 11 letter into an amended award, nor did Niece ask Judge Carter to construe the June 11 letter as an amended award.

In like vein, the judgment, filed on July 23, 2004, only referred to the first arbitration award, not the June 11 letter. It provided: "The Award of Arbitrator dated March 1, 2004 is confirmed." That is the judgment that was affirmed by us on the first appeal.

■ The California Arbitration Act (§ 1280 et seq.) has strict procedures on when an arbitration award may be corrected. Under section 1284, a party must apply to the arbitrator for correction no later than 10 days after service of a signed copy of the award on the applicant, other parties must object within 10 days after the application is delivered or mailed to them, and the arbitrator must issue any corrected award "not later than 30 days after service of a signed copy of the award on the applicant." (§ 1284; *Delaney, supra,* 99 Cal.App.4th at p. 657.) To the extent that the June 11 letter is viewed as a correction or modification of the original award, even Niece would agree that the arbitrator had no power to do so because he did not make the corrections within 30 days.

As *Delaney* establishes, an arbitrator has a longer period of time to *amend* his or her award to rule on a submitted issue, as long as the amendment is consistent with other findings on the merits of the controversy, does not cause demonstrable prejudice to the interests of a party, and is made before judicial confirmation of the original award. (*Delaney, supra,* 99 Cal.App.4th at p. 659.) But, even in *Delaney,* the arbitrator issued a "new final award" to incorporate the new amendment, which award included a discussion of the arbitrator's authority to do so. And the affected party filed a petition to confirm the "new final award," which petition was granted by the superior court and affirmed on appeal. (*Id.* at p. 653.)

Similarly, in *A.M. Classic Construction, Inc. v. Tri-Build Development Co.* (1999) 70 Cal.App.4th 1470 [83 Cal.Rptr.2d 449] (*A.M. Classic*), the arbitrator issued an amended award to resolve a subcontractor's claim against a school district which the arbitrator inadvertently had failed to resolve. As in *Delaney,* the Court of Appeal affirmed the judgment confirming the *amended* award.

■ The arbitrator issued no such amended award here. The June 11 letter is nothing more than what it purports to be—a letter, and should be given no greater dignity. The trial court never was asked to confirm it as part of an arbitration award. It certainly should not be allowed as a back door to get around the strict procedural requirements for correcting or amending arbitration awards. And we will not use it, after the fact, to justify vacating the second arbitration award, which correctly was denominated as an arbitration award and was confirmed as such by Judge Johnston. As a general rule, we indulge "every reasonable intendment to give effect to arbitration proceedings." (*A.M. Classic, supra,* 70 Cal.App.4th at p. 1474.) In the instant appeal, those proceedings are the ones leading to the second arbitration award.

One may speculate as to what would have occurred had Niece asked the arbitrator to incorporate the June 11 letter into an amended arbitration award. Perhaps the arbitrator would have expressly ordered a final distribution, using the same values and allocations as did accountant Roger Cannon in preparing exhibit 20. Such an amended award certainly would have achieved the goal of arbitral finality, and limited the need for judicial intervention.

But it is also possible that the arbitrator may have balked when pressed to formalize these sentiments into an amended award. Sons argue Niece deliberately refrained from expressly including exhibit 20 in her petition because she knew that "due to payment of expenses and other transactions during the ongoing trust administration, the numbers in Exhibit 20 do not even reflect the actual assets on hand for distribution so a distribution as proposed on Exhibit 20 could not literally be made even if ordered or agreed to."

Similarly, one may speculate what Judge Carter would have done had Niece amended her petition to confirm *both* the March 1 award *and* the June 11 letter. That scenario did not happen. Our appellate decision affirming the judgment on the first arbitration award did *not* encompass the June 11 letter, and we never expressed any opinion on what it meant.

Is there a cautionary lesson? Perhaps it is this: Formalities matter, particularly when dealing with the informality of arbitration. The process of judicially confirming an arbitration award is the time when it is necessary to "dress up" what otherwise can be a casual occasion. Be sure the arbitration award properly covers the submitted issues before wrapping it in the judicial cloak of confirmation.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent Kenneth J. Cummins. In light of their failure to prepare a proper record both in this appeal and in the first appeal in G034502, respondents Jeffrey S. Roehl and William E. Roehl shall bear their own costs on appeal.

Aronson, J., and Fybel, J., concurred.

A petition for a rehearing was denied February 26, 2007.