Filed 9/1/22 Certified for Publication 9/28/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID STARR et al., | |
|    Plaintiffs and Respondents, | G060277 |
|       v. | (Super. Ct. No. 30-2020-01125629) |
| JEFFREY MAYHEW, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Di Cesare, Judge. Affirmed.

Musick, Peeler & Garrett and Cheryl A. Orr for Defendant and Appellant.

Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Plaintiffs and Respondents.

\*      \*      \*

Defendant Jeffrey Mayhew and Plaintiffs David Starr and Thomas Hunt formed a limited liability company to operate a shopping center in Tustin. They agreed Mayhew would manage the company and Starr and Hunt would provide startup capital. In exchange, Mayhew was entitled to 50 percent of the company's profits and Starr and Hunt were entitled to the remaining 50 percent. After the shopping center's business declined in 2008, Mayhew asked Starr and Hunt for additional capital. They agreed to do so only if Mayhew also contributed capital. Mayhew reported a $100,000 contribution, which caused Starr and Hunt to contribute roughly the same amount. The shopping center was later sold for a substantial profit. Around this time, Mayhew claimed he was entitled to about 56.3 percent ownership interest in the company based on his additional capital contribution. Starr and Hunt disagreed and submitted the dispute to arbitration along with several other claims for damages. Mayhew disputed these claims and also argued the company's operating agreement entitled him to indemnity for any sums awarded against him.

The arbitrator ruled in favor of Starr and Hunt, finding Mayhew only held a 50 percent interest in the company. For their other claims, she awarded Starr and Hunt $53,384 in damages, $439,087.50 in attorney fees, and found that Mayhew would bear all arbitration costs. She also determined Mayhew was only entitled to $250,000 in indemnity for attorney fees. Mayhew sought clarification as to whether he was entitled to indemnity for any of the sums awarded against him. In response, the arbitrator issued a clarification of the award, stating he was not. The superior court later confirmed the award over Mayhew's petition to vacate and entered judgment against him.

On appeal, Mayhew asserts the trial court erred by failing to vacate the award. He contends the arbitrator lacked authority to clarify the award, that the award was procured by undue means, and that the arbitrator's award exceeded her powers. We disagree. Since Mayhew has failed to identify any basis for vacating the award, we affirm the judgment.

# I

## FACTS AND PROCEDURAL HISTORY

### A. *Formation and Sale of Company*

Mayhew, Starr, and Hunt formed Strata Tustin, LLC (Strata) in 2003 to develop a shopping center in Tustin. Starr and Hunt were investors in Strata (investing $350,000 and $250,000, respectively) while Mayhew agreed to manage the entity and provide sweat equity. Strata's operating agreement (the operating agreement) expressly identified Starr and Hunt as members at the company's formation, and they remained members throughout the relevant time period. Mayhew was identified as Strata's manager in the operating agreement, but it was ambiguous as to whether he was also a member.

For their respective contributions, the operating agreement specified Starr and Hunt owned a combined 50 percent share of Strata while Mayhew owned the remaining 50 percent. The operating agreement allowed for these ownership percentages to be modified if new members were admitted to Strata. Strata's capital structure and list of members were set forth on exhibit B of the operating agreement (exhibit B), which could be "modified as necessary to reflect the addition[] of new Members and/or new Capital Contributions."

The shopping center's business began to decline in 2008. During this period, Mayhew covered some of Strata's expenses, and he also deferred taking property management fees he was owed under the operating agreement. Eventually, in December 2012, Mayhew requested additional capital from Starr and Hunt to keep the company afloat. Starr and Hunt opposed the capital call unless Mayhew also contributed cash. Mayhew vowed to contribute $100,000 and requested that Starr and Hunt also provide $100,000. Rather than contributing $100,000 in cash, in March 2013, Mayhew forgave $100,000 of the debt Strata owed him and represented to Starr and Hunt he had made his contribution. Starr and Hunt later contributed a combined $99,340 in additional capital.

3

Strata's 2013 tax return reflected a capital contribution of $100,000 by Mayhew. But it also stated Mayhew only owned a 50 percent interest in Strata. Similarly, Mayhew received and signed schedule K-1 tax forms in 2013, 2014, 2015, 2016, and 2017, which all confirmed he only held a 50 percent interest in Strata.

The parties eventually listed the shopping center for sale in late 2017 or early 2018. It sold for $11,550,000 in July 2018. This resulted in a profit of roughly $7.8 million for Starr, Hunt, and Mayhew to share based on their ownership interests in Strata, which had become a source of dispute among the parties. In May 2018, while the property was listed for sale, Strata made its first ever distribution of profits. The distribution was accompanied by documentation prepared by Mayhew. It reflected he owned a roughly 56.3 percent interest in Strata, while Starr and Hunt's combined interest had decreased to 43.7 percent. Mayhew explained that under Strata's operating agreement, his $100,000 capital contribution in March 2013 allowed him to unilaterally increase his ownership of Strata by a proportionate amount. This was the first time Starr and Hunt were informed of any purported change to Strata's ownership structure. They had never consented to any such modifications. At their request, Mayhew served them with a copy of the amended exhibit B, documenting the changes.

*B. The Arbitration Proceeding*

In June 2018, Starr and Hunt filed individual and derivative claims on behalf of Strata with the American Arbitration Association. Primarily, they sought a declaration that Mayhew only held a 50 percent interest in Strata. In addition, they sought damages from Mayhew for (a) $350,000 for failing to collect common area maintenance charges, (b) $500,000 for failing to refinance Strata's debt at lower interest rates, (c) $150,000 for payment of excessive management fees to himself, (d) $75,000 for unsubstantiated expense reimbursements, and (e) an unspecified sum for failing to

4

execute a beneficial tax exchange of the shopping center under Internal Revenue Code section 1031. They also sought punitive damages.

After the initiation of arbitration but prior to the hearing, Mayhew requested an advance of attorney fees under an indemnity clause in Strata's operating agreement (the indemnity clause). The indemnity clause provided that Strata's "[m]anager . . . shall not be liable for and shall be indemnified and held harmless . . . from any loss or damage incurred by them, . . . in connection with the business of the Company, including costs and reasonable attorneys' fees and any amounts expended in the settlement of any claims of loss or damage resulting from any act or omission performed or omitted in good faith, which shall not constitute gross negligence or willful malfeasance, pursuant to the authority granted, to promote the interests of the Company." The arbitrator granted Mayhew $250,000 in advanced indemnity, and he requested additional indemnity during the arbitration hearing.

With respect to Strata's capital structure, Mayhew argued in arbitration that he was permitted to increase his ownership percentage under section 3.2.2 of the operating agreement. This section governed the addition of new members to Strata. It provides, "[i]t is anticipated that the Initial Members shall be joined in the investment by other Members. The percentage [of] ownership interest of such Members shall be proportionate to the percentage their Capital Contributions bear to the Capital Contributions all Members. To the extent required by law, the Manager shall amend this Agreement and take such other action as the Manager deems necessary or appropriate . . . to reflect the admission of those persons to the Company as a Member." Mayhew believed his capital contribution in March 2013 made him a new member, allowing him to proportionally increase his ownership stake. He further asserted that Section 3.2.2 and various other provisions of the operating agreement allowed him to modify Strata's ownership structure without Starr and Hunt's consent. In response, Starr and Hunt maintained Mayhew was a member at Strata's formation. Therefore, he was not entitled

5

to increase his ownership interest as a new member under section 3.2.2 through his purported capital contribution.

## C. *Arbitrator's Decision*

Following the hearing, the arbitrator issued her final award on December 9, 2019 (the final award). She found for Starr and Hunt on the ownership issue, ruling Mayhew only owned a 50 percent share of Strata. As for their other claims, the arbitrator concluded they were entitled to $53,384 in damages, consisting of "50% of $56,892 of unauthorized third party expenses charged by Mayhew, $19,938 in disallowed attorney's fees paid to Mayhew, and 50% of $10,000 of uncollected [common area maintenance] charges." Mayhew was not liable for any of the remaining claims, including punitive damages. The arbitrator awarded Starr and Hunt $439,087.50 in attorney fees and costs and ruled that Mayhew would be responsible for $53,897.30 in arbitration expenses.

As to indemnity, the arbitrator denied Mayhew's request for additional indemnity for his incurred attorney fees. But she also rejected Starr and Hunt's argument that Mayhew had been grossly negligent, was not entitled to any indemnity, and was required to refund the $250,000 in advanced indemnity. Rather, the arbitrator found Mayhew's "attorney fees to date compensated from [Strata would] be allowed but nothing further [was] deemed reasonable." There was no express statement in the final award as to whether Mayhew would be entitled to indemnity for any of the sums awarded against him. The final award only stated that "[p]ayment of the awarded sums remains as dictated by the Strata . . . Operating Agreement."

Mayhew filed a request for clarification on December 19, 2019, asking the arbitrator to clarify whether he was entitled to indemnity for the sums awarded against him. In response, the arbitrator issued a "Disposition for Application of Clarification of Award" on January 15, 2020 (the amendment). It stated, "[a]ll attorneys' fees and

6

damages awarded against Mr. Mayhew are his personal obligation and the company is not required to indemnify him for such fees and damages."[1]

Starr and Hunt filed a petition in the superior court to confirm the arbitration award, while Mayhew filed a petition to vacate it. On November 13, 2020, the court granted the former and denied the latter. It subsequently entered judgment against Mayhew and in favor of Starr and Hunt. Mayhew now appeals, arguing the court's confirmation of the award was erroneous for several reasons: (1) the arbitrator lacked power to issue the amendment; (2) the final award was procured through undue means; and (3) the arbitrator exceeded her powers by denying him indemnity and by denying him an increased ownership interest in Strata. We find no error and affirm the judgment.

## II

## DISCUSSION

### A. Relevant Law

On appeal from an order vacating or confirming an award, we review the trial court's findings of fact for substantial evidence and its legal conclusions de novo. (*Cooper v. Lavely & Singer Professional Corp.* (2014) 230 Cal.App.4th 1, 11-12.) But "[w]e apply a highly deferential standard of review to the [arbitrator's] award itself . . . ." (*Id*. at p. 12.) An "expectation of finality strongly informs the parties' choice of an arbitral forum over a judicial one. The arbitrator's decision should be the end, not the beginning, of the dispute." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 (*Moncharsh*).) As such, "arbitration awards are subject to an extremely narrow judicial review. [Courts] cannot review the merits of the controversy, the validity of the

---

[1] Starr and Hunt filed a motion to augment the record with certain documents concerning Mayhew's request for clarification or, in the alternative, for judicial notice of those documents. These documents are either already in the record or are immaterial to our analysis. The motion is denied, as is the request for judicial notice. As such, Mayhew's related motion to strike or disregard portions of Starr and Hunt's brief is rendered moot.

arbitrator's reasoning, or the sufficiency of the evidence supporting an arbitrator's award. . . . '[E]very reasonable intendment must be indulged in favor of the award.'" (*Luster v. Collins* (1993) 15 Cal.App.4th 1338, 1344-1345.)

Arbitrators also have wide latitude in crafting awards. They "'are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].' . . . '"Parties who stipulate in an agreement that controversies that may arise out of it shall be settled by arbitration, may expect not only to reap the advantages that flow from the use of that nontechnical, summary procedure, but also to find themselves bound by an award reached by paths neither marked nor traceable and not subject to judicial review."'" (*Moncharsh*, *supra*, 3 Cal.4th at pp. 10-11.)

*B. The Amendment Was Proper*

Mayhew's argument the arbitrator lacked power to issue the amendment is based on sections 1284 and 1286.6 of the Code of Civil Procedure.[2] These statutes permit an arbitrator to "correct" an award under two circumstances: (1) "[t]here was an evident miscalculation of figures or an evident mistake in the description of any person, thing or property referred to in the award"; or (2) "[t]he award is imperfect in a matter of form, not affecting the merits of the controversy." (§§ 1284, 1286.6, subds. (a) & (c).) Mayhew claims the amendment went beyond these narrow circumstances and constituted an improper reconsideration of the indemnity issue. We disagree. Aside from these statutes, there is a separate nonstatutory power to amend a final award. The amendment was a proper exercise of that power.

---

[2] All further undesignated statutory references are to the Code of Civil Procedure.

*1. Correcting and amending awards*

An arbitrator's power to "correct" an award under sections 1284 and 1286.6 is narrow. It is generally "limited to *evident* miscalculations of figures or descriptions of persons, things or property [citation] and *nonsubstantive* matters of form that do *not* affect the merits of the controversy." (*Century City Medical Plaza v. Sperling, Isaacs & Eisenberg* (2001) 86 Cal.App.4th 865, 877.) In addition to this statutory power to correct an award, however, arbitrators also possess a separate nonstatutory power to "amend" an award. (*Lonky v. Patel* (2020) 51 Cal.App.5th 831, 843 [describing power to correct and power to amend].) Unlike the power to correct, the power to amend allows an arbitrator to address substantive issues. The power to amend applies where "an issue is omitted from the award due to the arbitrator's inadvertence or mistake, the amendment is consistent with other findings on the merits, and the amendment does not cause demonstrable prejudice to any party's legitimate interests." (*Delaney v. Dahl* (2002) 99 Cal.App.4th 647, 650 (*Delaney*).)

For example, in *Delaney*, Joseph Delaney and several other parties brought malpractice claims against their former attorneys in arbitration. The body of the arbitrator's final award addressed Delaney's claim for malpractice. But the arbitrator's disposition of the various claims, which was located under a heading entitled "AWARD," failed to mention his malpractice claim. It only stated, "'Respondents AMERICAN PATRIOTS, INC., . . . and CATALINA TOYS, INC. . . . , shall take nothing on their counterclaims [for legal malpractice] against [their former attorneys].'" (*Delaney*, *supra*, 99 Cal.App.4th at p. 653.) The former attorneys requested a modification, and the arbitrator issued an amendment that inserted Delaney's name into "the relevant paragraph of the 'AWARD' section." (*Ibid*.)

On appeal, Delaney argued the amendment exceeded the arbitrator's power under sections 1284 and 1286.6. (*Delaney*, *supra*, 99 Cal.App.4th at p. 657.) This Division concluded that even if the amendment were improper under those statutes, it

was permissible under the court's nonstatutory power to amend. (*Id*. at p. 658.) "[T]he arbitrator had the authority to decide Delaney's malpractice claim," and the final award indicated that he did so. (*Ibid*.) The final award's "failure to mention Delaney under the 'AWARD' heading was the result of inadvertence or mistake on the arbitrator's part. [The law firm] advised the arbitrator and the other parties of the need for amendment, which then issued. The amendment did not prejudice the legitimate interests of any party, and the change was consistent with both the [final award] and the remainder of the [amendment]." (*Ibid*.)

*A.M. Classic Construction, Inc. v. Tri-Build Development Co.* (1999) 70 Cal.App.4th 1470 (*A.M. Classic*), involved a dispute between a subcontractor, contractor, and school district. The arbitrator's award failed to resolve an entire claim asserted by the subcontractor against the school district. (*Id*. at p. 1472.) The subcontractor contacted the arbitrator ex parte, asking him to rule on the omitted claim. (*Id*. at pp. 1472-1473.) This prompted the arbitrator to issue an amendment addressing that claim, which ruled in favor of the subcontractor. (*Id*. at p. 1473.) On appeal, the court rejected the school district's contention that the arbitrator had improperly modified the award. (*Id*. at p. 1472.) The claim was raised during the proceedings, and the parties agreed the arbitrator had authority to decide it. (*Id*. at p. 1476.) Further, the amendment was promptly made and was "not inconsistent with other provisions of the original award and it [did] not substantially prejudice the legitimate interests of any party. . . . [T]he arbitrator was simply finishing his assignment by making a complete and full award on the matters submitted to him for resolution." (*Ibid*.)

Like *Delaney* and *A.M. Classic*, the amendment here was within the arbitrator's power to amend. It is undisputed the general indemnity issue was before the arbitrator. The final award expressly addressed indemnity within the context of Mayhew's incurred attorney fees. But through mistake or inadvertence it was ambiguous as to whether Mayhew could seek indemnity for the sums awarded against him. The

10

amendment clarified this ambiguity by stating Mayhew could not. This finding was consistent with the final award, which had already concluded additional indemnity for attorney fees was unreasonable due to Mayhew's poor management, including a "borderline [violation] of fiduciary duty." Nor has Mayhew shown the amendment is substantially prejudicial to his legitimate interests. Rather, it was Mayhew that filed an application for clarification, which led to the amendment.

Mayhew also maintains the amendment amounts to an improper reconsideration of the indemnity issue. (See *Lonky v. Patel*, *supra*, 51 Cal.App.5th at p. 843 [amendment power does not allow the arbitrator to reconsider the original award's merits].) His argument is derived from the last page of the final award, which states, "[p]ayment of the awarded sums remains as dictated by the [Strata] Operating Agreement." Under Mayhew's interpretation, this statement means the indemnity clause applies to the sums awarded against him, entitling him to indemnity for them. Based on this understanding, he insists this statement from the final award is inconsistent with the amendment, which denied Mayhew any indemnity for such sums. He thus concludes the arbitrator improperly reversed herself on the indemnity issue in the amendment.

This argument is unconvincing. Mayhew reads too much into this general statement from the final award, which contains no express reference to indemnity. Nor does anything in the record suggest this statement was meant to address indemnity. To the contrary, prior to issuing the amendment, the arbitrator sent a letter to the parties. In that letter, the arbitrator "*confirmed her intention* [in the final award was] that the attorneys' fees and damages awarded against Mr. Mayhew [were] his personal obligation and the company [was] not required to indemnify him . . . ." (Italics added.) Put differently, Mayhew's interpretation of the above statement from the final award is inaccurate. This statement was never intended to indicate that he was entitled to any indemnity for the sums awarded against him. Rather, the arbitrator intended for these

11

sums to be Mayhew's personal obligation in the final award. The amendment only clarified this intention, which is what Mayhew asked the arbitrator to do.

Next, Mayhew appears to contend that under the indemnity clause, the arbitrator could only deny him indemnity if he acted with "gross negligence or willful malfeasance." While the arbitrator found Mayhew's conduct "was negligent for sure" and a "borderline [violation] of fiduciary duty," she concluded it fell "just short of gross negligence." Because the arbitrator did not find him grossly negligent, Mayhew argues she necessarily ruled he was entitled to indemnity in the final award and later improperly reversed herself in the amendment.

This argument is also unpersuasive. The findings in the final award and amendment are consistent. Contrary to Mayhew's assertion, the arbitrator did not deny him indemnity in the final award. Rather, she found he was only entitled to a reasonable amount of indemnity: the $250,000 that was advanced to him. Starr and Hunt argued Mayhew had been grossly negligent, was not entitled to *any* indemnity, and demanded he repay the $250,000. The arbitrator rejected this argument in the final award. She concluded Mayhew had not been grossly negligent (the finding cited by Mayhew), which allowed him to retain the $250,000. But she stated that any further indemnity for attorney fees was unreasonable. The arbitrator clarified her indemnity ruling in the amendment, which made clear that Mayhew was not entitled to any other indemnity for the sums awarded against him. In other words, the final award stated Mayhew was allowed $250,000 in indemnity, and the amendment clarified he was not entitled to any other indemnity beyond that amount. There is no inherent conflict between the two findings.

*2. Timeliness of amendment*

Mayhew also argues the amendment was untimely because it was issued more than 30 days after the final award. But he first makes this argument in his reply

12

brief. "'[I]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party.'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218-1219.) Accordingly, courts will not consider such an argument "absent a showing why the argument could not have been made earlier." (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.) Mayhew has not explained why this argument was excluded from his opening brief. Therefore, we will not consider it.[3]

## C. The Award Was Not Procured By Undue Means

### 1. Mayhew's argument

Next, Mayhew maintains the trial court erred by failing to vacate the arbitrator's award under section 1286.2 subdivision (a)(1), which requires courts to vacate an award "procured by corruption, fraud or other undue means." Generally, he argues the arbitrator's finding that he was only entitled to a 50 percent share in Strata was procured by undue means. This argument requires some explanation.

As discussed above, Mayhew believed he became a new member in Strata based on his capital contribution in March 2013. This allegedly allowed him to proportionately increase his ownership interest under section 3.2.2 of the operating agreement without Starr and Hunt's consent. Mayhew contends the arbitrator only rejected this theory due to an intentional misrepresentation of law concerning the consent issue in Starr and Hunt's closing brief. Specifically, their closing brief asserted the operating agreement was governed "by the Revised Uniform Limited Liability Company

---

[3] We note that appellate courts disagree on the deadline for arbitrators to amend their awards under the nonstatutory amendment power. "[S]ome hold that amendment is timely as long as it is prior to 'judicial confirmation of the original award.'" (*Lonky v. Patel*, *supra*, 51 Cal.App.5th at p. 843.) "[O]thers hold that amendment must occur within" 30 days after the final award is served. (*Ibid*.) This Division has adopted the former view on several occasions. (See, e.g., *Roehl v. Ritchie* (2007) 147 Cal.App.4th 338, 340, 348; *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 159-160; *Delaney*, *supra*, 99 Cal.App.4th at pp. 658-659.)

Act ('RULLCA'). [Former Corporations Code] [s]ection 17704.07(c)(4)(D) (2013) of [the] RULLCA provided that in a manager-managed LLC (like [Strata]) '[t]he consent of all members of the limited liability company [was] required to . . . : [a]mend the operating agreement.' Starr and Hunt never consented to any amendment of [Strata's] operating agreement either before, during, or after 2013. [Citation.] Accordingly, any purported change to the [ownership structure on the] agreement's Exhibit B ha[d] no force or effect as a matter of law."[4] (Fn. omitted.)

Starr and Hunt's argument appears to be legally incorrect, as the RULLCA was not operative law in 2013, when Mayhew purportedly amended the operating agreement to increase his ownership percentage. The RULLCA was enacted in 2012, but it was not operative until January 1, 2014. (Former Corp. Code § 17704.07, added by Stats. 2012, ch. 419, § 20, operative Jan. 1, 2014.) Mayhew pounces on this apparent error. He asserts Starr and Hunt intentionally misrepresented that the RULLCA was effective in 2013. He posits this was done to deceive the arbitrator into believing it applied to the operating agreement and that Star and Hunt's consent was required for Mayhew to amend exhibit B. In particular, he suggests the inclusion of "(2013)" following their citation to the RULLCA is evidence of their intent to mislead.

According to Mayhew, this purported misrepresentation caused the arbitrator to ignore the provisions of the operating agreement that allowed him to unilaterally amend exhibit B. It also "deceived [the arbitrator] into relying upon the inapplicable provisions of the RULLCA to find that [Mayhew] had acted improperly" in increasing his ownership share without Starr and Hunt's consent. Since Starr and Hunt's

---

[4] Similarly, Starr and Hunt's reply to Mayhew's closing brief argued another provision of the RULLCA required "a 'manager [to] promptly furnish to a member a copy of any amendment to the . . . operating agreement executed by a manager pursuant to a power of attorney from the member.'" (Quoting former Corp. Code, § 17704.10, subd. (d), added by Stats. 2012, ch. 419, § 20, operative Jan. 1, 2014.)

14

closing brief was submitted after the hearing, Mayhew claims he was denied a meaningful opportunity to rebut the misrepresentation, which constitutes undue means.

As explained below, this argument is unpersuasive. The purported misrepresentation does not constitute undue means because Mayhew had a sufficient opportunity to rebut it. And even if it did, Mayhew has not shown a sufficient nexus between the alleged misrepresentation and the arbitrator's denial of his claim for an increased ownership interest in Strata. Among other things, whether the purported misrepresentation had any effect on the arbitrator's award requires speculation.

*2. Analysis*

Section 1286.2 does not define "undue means." Nor are we aware of any case that provides a clear definition of the term. Though no clear standard has been articulated, cases suggest the term refers to unfair conduct that """"deprives either party of a fair and impartial hearing to his substantial prejudice."""" (*Maaso v. Signer* (2012) 203 Cal.App.4th 362, 371-372; *Baker Marquart LLP v. Kantor* (2018) 22 Cal.App.5th 729, 739-741; *Pour Le Bebe, Inc. v. Guess? Inc.*(2003) 112 Cal.App.4th 810, 827, 833-834.) Here, the alleged misrepresentation does not meet this standard. Mayhew had the opportunity to address Starr and Hunt's RULLCA argument before and after the arbitration hearing.

Mayhew's argument focuses on Starr and Hunt's closing brief, which was filed after the hearing. But it ignores a similar argument they made under the RULLCA in their trial brief, which was filed *before* the hearing. Their trial brief argued Mayhew could not unilaterally amend the operating agreement under former Corporations Code section 17704.07, subdivision (r)(2). Crucially, this statute was also added by the RULLCA. (Former Corp. Code, § 17704.07, subd. (r)(2), added by Stats. 2012, ch. 419, § 20, operative Jan. 1, 2014.) Indeed, Starr and Hunt's trial brief cites the same statute as their closing brief, former Corporations Code section 17704.07, just a different

15

subdivision. And even though the briefs cite different subdivisions, the trial brief's RULLCA argument is nearly identical in substance to the closing brief's RULLCA argument: Mayhew could not amend the operating agreement (i.e., increase his ownership interest) without Starr and Hunt's consent. As such, Mayhew had sufficient opportunity to address at the hearing the RULLCA's applicability to the purported amendment of the operating agreement.

Further, Mayhew expressly argued the RULLCA did not apply to the operating agreement in his reply to Starr and Hunt's closing brief. He asserted, "[t]he effective date of the RULLCA is January 1, 2014 [citation], not January 1, 2013 as claimed by [Starr and Hunt]." Mayhew also argued that under the applicable law in 2013, "'[a] written operating agreement may prescribe the manner in which the operating agreement may be altered, amended, or repealed.' . . . When Mayhew contributed capital in 2013, he became a Member and, pursuant to the authority vested in him by the [operating agreement] and by this statute, he subsequently reflected that change in the Amendment [to the operating agreement], an amendment which specifically did not require [Starr and Hunt's] consent." (Underlining omitted.)

Because Mayhew had the opportunity to rebut the RULLCA argument at the arbitration hearing and fully addressed it in his reply brief, he was not deprived of a fair arbitration. As such, Starr and Hunt's erroneous implication in their closing brief that the RULLCA was operative in 2013 does not constitute undue means. To the extent the arbitrator believed the RULLCA applied to the operating agreement, at most, that was an error of law, which is beyond judicial review.[5] (See *Moshonov v. Walsh* (2000) 22 Cal.4th 771, 775-776 (*Moshonov*).)

Besides, even if Mayhew were able to establish undue means, "a court should not presume that . . . evidence procured by undue means had an impact on the

_____

[5] To be clear, we make no finding as to whether the RULLCA actually applied to the operating agreement.

16

arbitrators. Since 'arbitrators are not required to state the reasons for their decisions'; we 'presume[] the arbitrators took a permissible route to the award where one exists'; . . . the moving party *needs to demonstrate a nexus* between the award and the alleged undue means used to attain it." (*Pour Le Bebe, Inc. v. Guess? Inc.*, *supra*, 112 Cal.App.4th at pp. 833-834, italics added.) Mayhew has not done so. It is entirely speculative as to whether the arbitrator considered the RULLCA in her analysis. Even if the arbitrator was misled into believing the RULLCA applied to the operating agreement (and assuming this constitutes undue means), this deception did not materially affect her ruling. It would have remained the same regardless. The arbitrator provided several independent grounds for denying Mayhew's claim to an additional share of Strata, the majority of which are unrelated to the RULLCA argument:

- Mayhew "was a member from the outset as well as a manager in that he was to contribute $1,000 in capital." Thus, he could not increase his ownership interest in Strata as a new member under section 3.2.2 of the operating agreement.

- "Mayhew never expressed to Starr/Hunt a different percentage than 50% even though year after year he signed IRS K-1 documents verifying a 50% share. Estoppel should apply as Mayhew enjoyed the benefits and detriments as a 50% owner."

- "Starr/Hunt expressed a clear opposition to the capital call unless Mayhew also contributed cash. . . . When Mayhew did not contribute cash but instead forgave debt owed by the company to him he did not give notice that by doing so his share increased and their[']s was diluted."

- "Mayhew did not until May 2018 ever serve an [amended] [e]xhibit B. He cannot say when he prepared it and admitted he likely did not do so contemporaneously with his 'contribution.' It is too coincidental that by May 2018 that the very lucrative sales price for the [shopping] center was known

17

and it was convenient for Mayhew to succumb to the temptation to claim an increase as it would result in a significant gain for him. As a fiduciary he cannot in fairness and good conscience believe it was reasonable for the first time, almost five years later, to claim a specific percentage increase for his personal benefit as a reward for finding a beneficial buyer."

• It "must be considered . . . that the capital call [which led to Mayhew's purported capital contribution in 2013] was only necessitated due to Mayhew's poor accounting and negligent management."

• An amended copy of exhibit B "was only revealed to Starr/Hunt after they refuse[d] in April 2018 to agree to his demand for a greater share because of his astute and successful development of the corner lot 'Phase II.'"[6]

• "Finally, Starr/Hunt never expressly agreed to the [e]xhibit B Amendment to the Operating Agreement."

The RULLCA argument concerned whether Mayhew needed Starr and Hunt's consent to amend exhibit B, which set forth Strata's ownership structure. At most, this argument only directly concerns the final ground cited by the arbitrator. Even if we assume the final ground was influenced by the RULLCA argument, there are numerous other grounds that independently support the arbitrator's ruling. Though Mayhew argues several of these other grounds were also influenced by Starr and Hunt's erroneous RULLCA argument, his assertions are too speculative to overcome the presumption of correctness. (*Pour Le Bebe, Inc. v. Guess? Inc.*, *supra*, 112 Cal.App.4th at pp. 833-834.) Consequently, even if Mayhew were able to show Starr and Hunt's RULLCA argument constituted undue means – which he has not – he has failed to show the award was procured through such conduct.

---

[6] Phase II refers to a parcel of land that was adjacent to the initial parcel owned by Strata. Mayhew acquired the Phase II parcel for Strata in 2004 to expand the shopping center. Mayhew believed this acquisition greatly increased the shopping center's value.

18

*D.  The Arbitrator Did Not Exceed Her Power*

Mayhew makes two arguments under section 1286.2, subdivision (a)(4). This statute requires a court to vacate an award if the "arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted."  (§ 1286.2, subd. (a)(4).)  "This exception is narrowly construed. Arbitrators do not exceed their powers by reaching erroneous factual or legal conclusions on the merits of the parties' claims, even if the award causes substantial injustice to one of the parties."  (*Emerald Aero, LLC v. Kaplan* (2017) 9 Cal.App.5th 1125, 1138.)

Further, "'[a]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action.'"  (*Moncharsh*, *supra*, 3 Cal.4th at pp. 10-11.)  "Absent an express and unambiguous limitation in the contract or the submission to arbitration, an arbitrator has the authority to find the facts, interpret the contract, and award any relief rationally related to his or her factual findings and contractual interpretation."  (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1182.)


*1.  Mayhew's contractual right to indemnity*

Mayhew contends the arbitrator exceeded her powers by failing to award him indemnity.  The indemnity clause states the manager "*shall* be indemnified" for applicable claims.  (Italics added.)  Based on this language, he asserts the operating agreement entitled him to indemnity.  The arbitrator's denial of indemnity, he concludes, constitutes "a remedy forbidden by the Operating Agreement."  We disagree.  Nothing in the operating agreement prevented the arbitrator from limiting the amount of his indemnity based on equitable principles.  (See *Moncharsh*, *supra*, 3 Cal.4th at pp. 10-11.)

In *Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 847-847 (*Cohen*), a real estate investment company offered investments

19

in the form of promissory notes. Cohen, an attorney and investment advisor, recommended the notes to his clients and, in return, received fees and commissions from them. The investment company eventually defaulted on the notes. (*Id*. at pp. 848-849.) Cohen filed claims in arbitration against the investment company on behalf of himself, his firm, and his clients. (*Ibid*.) He and his law firm also paid his clients' attorney fees. The arbitrator ultimately found for the clients and deemed them prevailing parties. But it also ruled Cohen and his firm were not prevailing parties. (*Id*. at p. 854.)

The relevant arbitration agreements contained provisions entitling prevailing parties to attorney fees. Yet, the arbitrator awarded the clients no fees because their fees had already been paid by nonprevailing parties, i.e., Cohen and his firm. The arbitrator reasoned, "Cohen, whose law firm had advanced the attorneys' fees and costs, was 'culpable for advising his clients to invest in the [notes].'" (*Cohen*, *supra*, 31 Cal.App.5th at p. 873.) "'Awarding attorneys' fees and costs to the law firm whose founding partner is a culpable party, who profited from his mistaken advice, would be a gross injustice and violate the equitable principle of unclean hands.'" (*Ibid*.)

On appeal, the appellants maintained the arbitrator had exceeded his authority by failing to award the clients their attorney fees under the mandatory fee provisions. (*Cohen*, *supra*, 31 Cal.App.5th at p. 873.) The court disagreed. It found "the arbitrator interpreted the [relevant] agreements as giving him discretion to deny an award of attorneys' fees where the prevailing parties' fees had been paid by a nonprevailing party. The arbitrator had the authority to make that interpretation." (*Id*. at p. 876.) The relevant agreements "did not explicitly and unambiguously limit the arbitrator's power to interpret the agreements in this manner." (*Id*. at pp. 876-877.) Absent such an express limitation, "[t]o construe [the attorney fee provision] otherwise would 'intrude upon the "broad powers" [citation] of the arbitrator to decide' questions of contract interpretation and would 'improperly expand the "narrow limitation on arbitral finality."'" (*Id*. at p. 877.)

20

Here, the arbitrator awarded Mayhew $250,000 in indemnity for his attorney fees but found any additional indemnity for such fees was unreasonable for equitable reasons. Specifically, she found "[t]here were numerous problems with recordkeeping, contemporaneous invoicing of expenses, sloppy bank reconciliation and commingling of funds from other projects. However, [she found] Mayhew's conduct [fell] just short of gross negligence, but was negligent for sure and [a] borderline [violation] of fiduciary duty. His attorneys fees to date compensated by [Strata would be] allowed but nothing further [was] deemed reasonable." Based on these statements, it appears the arbitrator implicitly concluded it would be inequitable to award Mayhew further indemnity for attorney fees due to his inept management. Among other things, his conduct amounted to a breach of fiduciary duty.[7]

The final award addresses indemnity in the context of attorney fees. Neither the final award nor the amendment explain the arbitrator's denial of additional indemnity for the sums awarded against Mayhew. We must reasonably infer this decision was based on the same reasons the arbitrator denied him further indemnity for his incurred attorney fees: any additional award of indemnity to Mayhew would be inequitable due to his conduct. (See *Ajida Technologies, Inc. v. Roos Instruments, Inc.*, *supra*, 87 Cal.App.4th at p. 541; *Luster v. Collins*, *supra*, 15 Cal.App.4th at pp. 1344-1345.) Nothing in the operating agreement specifically prevented the arbitrator from limiting the amount of Mayhew's indemnity based on equitable principles. As such, she was authorized to interpret the operating agreement in this manner, and her interpretation is not subject to judicial review. (*Cohen*, *supra*, 31 Cal.App.5th at pp. 876-877; *Moshonov*, *supra*, 22 Cal.4th at pp. 775-776.)

---

[7] We note the parties dispute whether the arbitrator actually found a breach of fiduciary duty. We conclude she did. A borderline violation can still be a violation and "'we must draw every reasonable inference to support the award.'" (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 541.)

21

Based on his reading of the indemnity clause, Mayhew appears to believe the arbitrator could only deny him full indemnity if she found he was grossly negligent or willfully malfeasant. The relevant portion of the clause states the manager shall be indemnified for "any loss or damage incurred by them . . . including . . . any amounts expended in the settlement of any claims of loss or damage resulting from any act or omission performed or omitted in good faith, *which shall not constitute gross negligence or willful malfeasance*, pursuant to the authority granted, to promote the interests of [Strata]." (Italics added.) But this provision only seems to establish that "gross negligence" and "willful malfeasance" do not constitute good faith acts or omissions for purposes of indemnity. It does not unambiguously restrict an arbitrator from awarding a limited amount of indemnity for equitable reasons, such as a manager's breach of fiduciary duty. Absent such an express limitation within the indemnity clause, we cannot conclude the arbitrator's interpretation of the operating agreement exceeded her powers. (*Cohen*, *supra*, 31 Cal.App.5th at pp. 876-877; *Moshonov*, *supra*, 22 Cal.4th at pp. 775-776.)

We are unpersuaded by Mayhew's citations to *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, and *DiMarco v. Chaney* (1995) 31 Cal.App.4th 1809. As our Supreme Court has explained, both cases involved unique circumstances in which the arbitrator's remedy expressly contradicted the relevant agreement. (*Gueyffier v. Ann Summers, Ltd.*, *supra*, 43 Cal.4th at pp. 1187-1188.) That is not true here. We also note the relevant holdings from *O'Flaherty* and *DiMarco* have been narrowly interpreted and/or rejected by subsequent courts. (See, e.g., *VVA-TWO, LLC v. Impact Development Group, LLC* (2020) 48 Cal.App.5th 985, 1006 ["We read [*O'Flaherty*] as limited to its very unique facts, as have several other courts"]; *Cohen*, *supra*, 31 Cal.App.5th at p. 876 [Agreeing with several courts that "the reasoning of *DiMarco* is not persuasive. [E]ven the court that decided *DiMarco* has acknowledged that subsequent Supreme Court opinions have 'expressed ambivalence about the *DiMarco* decision'"].)

Mayhew also argues the arbitrator's award violates Corporations Code 17704.08, subdivision (a), which states, "[a] limited liability company shall reimburse for any payment made and indemnify for any debt, obligation, or other liability incurred by . . . the manager of a manager-managed limited liability company in the course of the . . . manager's activities on behalf of the limited liability company" so long as the manager complied with his fiduciary duties. Since Mayhew breached his fiduciary duties, this statute is inapplicable.

### 2. *Mayhew's contractual right to profit participation*

Next, Mayhew maintains the arbitrator exceeded her powers by depriving him of an increased ownership percentage in Strata. He again asserts the operating agreement expressly allowed him to unilaterally increase his ownership percentage following his purported $100,000 capital contribution in 2013. The arbitrator's denial of an additional ownership interest in Strata, he contends, deprived him of his contractual rights under the operating agreement. We disagree.

As set forth above in section II.C, the arbitrator provided several reasons for denying Mayhew an increased interest in Strata. For example, she found Mayhew was not entitled to additional ownership for his purported capital contribution because "[h]e was a member from the outset . . . ." The arbitrator also appears to have read a good faith requirement into Mayhew's ability to increase his ownership interest, and she concluded he did not act in good faith.[8] For example, she found Mayhew only revealed exhibit B after Starr and Hunt "refuse[d] in April 2018 to agree to his demand for a greater share because of his astute and successful development of the corner lot 'Phase II.'" She also stated that "[it was] too coincidental that" Mayhew began claiming to own

---

[8] We note that it is well established that "there is an implied covenant in all contracts that the parties will act in good faith." (*Milton v. Hudson Sales Corp.* (1957) 152 Cal.App.2d 418, 427-428.)

23

a larger share of Strata around the same time "the very lucrative sales price for the [shopping] center was known." The arbitrator also determined Mayhew was estopped from claiming a larger percentage because he had "signed IRS K-1 documents verifying a 50% share" for years. Likewise, she appeared to find he was equitably barred from increasing his ownership percentage based on a capital call that "was only necessitated due to [his] poor accounting and negligent management."

We reiterate these points to show the arbitrator's denial of Mayhew's claim for additional ownership was based on findings of fact and law. No matter how Mayhew tries to recast his arguments, they are simply challenges to the arbitrator's factual and legal conclusions, which are not subject to judicial review. (*Moshonov*, *supra*, 22 Cal.4th at pp. 775-776.)

In a related argument, Mayhew claims the arbitrator deprived him of his statutory rights under former Corporations Code section 17202, added by Statute 1994, chapter 1200, section 27, effective September 30, 1994. But this statute is inapplicable. It only applies if the operating agreement does not specify how profits and losses will be allocated among members. (Former Corp. Code, § 17202.) Here, the operating agreement states Strata's profits and losses would be allocated 50 percent to Starr and Hunt and 50 percent to Mayhew.

24

## III

## DISPOSITION

The judgment is affirmed.  Starr and Hunt are entitled to their costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.

Filed 09/28/2022

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID STARR et al., | |
| Plaintiffs and Respondents, | G060277 |
| v. | (Super. Ct. No. 30-2020-01125629) |
| JEFFREY MAYHEW, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Appellant. | |

Attorney Sean C. Rotstan from the law firm of Jeff Lewis Law, APC, has requested that our opinion, filed on September 1, 2022, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(2). The request is GRANTED.

The opinion is ordered published in the Official Reports.

MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.

1